**S. & W CONSTRUCTION AND
MATERIALS COMPANY,
INC., Plaintiff,**

v.

**DRAVO BASIC MATERIALS
COMPANY, INC.,
Defendant.**

Civ. A. No. J91–0145(L).

United States District Court,
S.D. Mississippi,
Jackson Division.

Sept. 4, 1992.

Wayne Dowdy, Magnolia, William C. Walker, Jr., Oxford, MS, for plaintiff.

John G. Corlew, Paul H. Stephenson, III, Jackson, MS, for defendant.

## MEMORANDUM OPINION AND ORDER

TOM S. LEE, District Judge.

This cause is before the court on the motion of defendant/counter-plaintiff Dravo Basic Materials Co., Inc. (Dravo) for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiff/counter-defendant S & W Construction and Materials Co., Inc. (S & W) has submitted its response to the motion. The court has considered the memoranda of authorities together with attachments submitted by the parties and concludes that Dravo's motion is well taken and should be granted.

### I. S & W'S ALLEGATIONS

S & W, a construction material supplier,[1] brought this action against Dravo, a producer and supplier of aggregate materials such as oyster and reef shell, asserting a claim for unlawful price discrimination under § 2(a) of the Robinson–Patman Act,[2] as well as state law claims for intentional interference with contracts and prospective contracts and conspiracy to destroy S & W's business.

1. S & W purchases materials such as crushed limestone, rip rap, clam shell and reef shell from producers for resale to governmental entities, construction contractors or individuals for home specialty use.

2. Section 2(a) of the Robinson–Patman Act, 15 U.S.C. § 13(a), provides in pertinent part:
 It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality ... where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination....

3. S & W makes much of the fact that Dravo has admitted that at this meeting Fore of Coast "went as far as to request a permanent $2.00 to

S & W charged that on October 11, 1989, Dravo, through one of its vice-presidents Steve Allen, met with one of S & W's competitors in the Gulf Coast area, W.C. Fore of Coast Materials (Coast), and entered into a conspiracy to fix prices in an effort to destroy competition and, in particular, to destroy S & W's business. Specifically, S & W alleged that Allen agreed to and allowed Fore to purchase two barges of reef shell at a price of $10.50 per cubic yard, which was $1.50 less than the $12.00 price charged S & W for like grade and quality of reef shell.[3] According to S & W, the $10.50 price prevented S & W from profiting on shell deliveries to three jobs— "City of Gulfport," "Forrest Avenue" and "Division Street"—on each of which S & W was an "alternate bidder" to Coast.[4] S & W additionally alleged that, in accordance with their agreement and as part of the conspiracy with Coast, Dravo refrained from delivering shell to Coast's competitors in Harrison and Hancock counties; continued to charge Coast a lower price for 1990 shell deliveries than it charged S & W; delayed deliveries of shell to S & W; and refused to quote or even inform S & W that it would not quote "shell prices" until it was too late for S & W to bid in competition with Dravo on the "Vicksburg Corps of Engineers project." S & W seeks treble damages under § 4 of the Clayton Act[5] for

$3.00 price preference to enable Coast Materials to drive other shell dealers out of business." However, as will be discussed *infra* in regard to S & W's state law claims, the record demonstrates that Dravo never afforded Coast any such price preference. Because the Robinson–Patman Act prohibits price discrimination in actual sales only and nothing more, *see infra* at pp. 18–19, Fore's unaccepted price "request" is irrelevant to S & W's Robinson–Patman claim.

4. Under Mississippi law, a governmental entity seeking bids on a project may use alternates on term contracts in the event the prime contractor is not able to perform under the terms specified in the contract or it is not able to honor its prices. Coast was the prime contractor and S & W was an alternate on each of these projects.

5. Section 4 of the Clayton Act, 15 U.S.C. § 15, provides:
 Any person who shall be injured in his business or property by reason of anything

Dravo's alleged Robinson–Patman violation, as well as an award of punitive damages under its state law claims.

Dravo does not contest that Allen did in fact meet with Fore on October 11, 1989, and agreed to sell and deliver to Coast two barges of reef shell at a price of $10.50 per cubic yard. Dravo does contend, however, that the $10.50 price afforded Coast did not violate Robinson–Patman due to the fact that there was no substantial lessening of competition since the one-time price allowance covered only prior commitments Coast made months before the October 11, 1989, meeting.[6] Dravo further maintains that the $10.50 price did not yield an adverse price difference sufficient to create a Robinson–Patman violation when compared to the prices afforded S & W during the same time period. Finally, Dravo asserts that even if S & W could establish a prima facie Robinson–Patman violation, summary judgment in its favor is in order since S & W cannot show the antitrust injury necessary to recover under § 4 of the Clayton Act. Dravo also seeks summary judgment on its counterclaim against S & W for S & W's failure to pay Dravo $18,701.52 for goods previously sold, delivered and accepted.

## II. SUMMARY JUDGMENT STANDARD

This court's analysis of Dravo's motion for summary judgment must necessarily focus on the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits" submit-

---

forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover three-fold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

**6.** Dravo explains in its brief how this meeting came about as follows:

Shells were in short supply for Dravo's Southeast Division in early and mid 1989. Due to this supply shortage and strong demand, effective July 1, 1989, Dravo raised its prices for reef shell from $10 to $12 per cubic yard. The price increase met with much customer dissatisfaction. Customer discontent became so great that Dravo's president directed the vice president of the Southeast Division, T.S. Allen, to visit personally with customers. Mr. Allen, accompanied by the Southeast Division's marketing manager for construction aggregates and the Mississippi Gulf Coast area sales representative (Bobby Bell), made such visits. In particular they met on October 11, 1989, with W.C. Fore, president and owner of Coast Materials, and Melvin Jolly, Coast Materials' vice president. Mr. Allen had never met Mr. Fore before this October 11 meeting. The meeting addressed the business relationship between Dravo and Coast Materials. Mr. Fore raised Coast Materials concerns about both the shell price increase and shell shortage. Mr. Allen attempted to explain the shell shortage due to priority obligations in Louisiana. Mr. Fore flatly refused to pay the $12 reef shell price. Mr. Fore emphasized Coast Materials' substantial investment in property and equipment which he thought positioned Coast Materials, unlike its competition, to be a particularly valuable customer. He insisted Coast Materials would purchase limestone from a Dravo competitor before paying such shell prices to Dravo. Mr. Fore complained the price increase unfairly came after Coast Materials made commitments based on the old price. He claimed Coast Materials needed shell at the old price to satisfy prior shell commitments to avoid losing money.

The threat of losing Coast Materials' business understandably concerned Mr. Allen. Dravo hoped to sell Coast Materials, which operated a large facility with a full materials yard, not just shell but a full line of aggregate. Coast Materials was already warehousing agricultural lime for Dravo. Consequently, Mr. Allen offered certain price concessions from the quoted price of $12 per cubic yard based on Mr. Fore's representations. Consistent with prior Dravo practices, Mr. Allen agreed to recognize Coast Materials' commitments outstanding at the time of the price increase. He promised Mr. Fore two barges of reef shell at $10.50 per cubic yard to be delivered as soon as available. Mr. Allen also stated Dravo's price to Coast Materials for reef shell thereafter would be $11.50 until further notice.

Mr. Fore's remarks were not limited to the price afforded Coast Materials. He also argued Dravo need not sell shell to other shell dealers operating in Coast Materials' area. Mr. Allen stated, however, that Dravo could not turn down orders or refuse to sell to such people. According to Mr. Bell, Mr. Fore went so far as to request a permanent $2 to $3 price preference to enable Coast Materials to drive other shell dealers out of business. Questioning the legality of such an arrangement, Mr. Allen declined to commit to any such pricing practice. Dravo never afforded Coast Materials any such price preference.

This version of the meeting is supported by record evidence, including deposition testimony, interrogatory responses and affidavits.

ted by the parties. Fed.R.Civ.P. 56(c). Under Rule 56, the party moving for summary judgment must come forward with an initial showing that it is entitled to judgment. This burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). Once the movant makes a properly supported motion, the burden shifts to the nonmovant to demonstrate the existence of a genuine dispute. Under Rule 56(e), "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth *specific facts* showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e) (emphasis added). When summary judgment is requested in the context of antitrust litigation, adherence to this standard is appropriate. *See, e.g., Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Applying these standards, the court first concludes that Dravo has presented a properly supported motion pointing out to the court the absence of evidence to support either S & W's Robinson–Patman claim or its state law claims. The court further finds that S & W's response to the motion has failed to demonstrate the existence of a genuine dispute as to any fact material to the resolution of this case. Therefore, for the reasons that follow, the court is of the opinion that Dravo is entitled to judgment as a matter of law as to all claims asserted against Dravo by S & W, as well as Dravo's counterclaim.

## III. THE ALLEGED VIOLATION OF THE ROBINSON–PATMAN ACT

In order to recover treble damages under § 4 of the Clayton Act, "a plaintiff must prove (1) a violation of the antitrust laws, (2) cognizable injury attributable to the violation, and (3) at least the approximate amount of the damage." *Chrysler Credit Corp. v. J. Truett Payne Co., Inc.,* 670 F.2d 575, 579 (5th Cir.1982) (citations omitted). The antitrust violation alleged in this case is unlawful price discrimination affecting secondary line competition, "that is, price discrimination by the seller which affects competition among its buyers." *Id.* As to secondary line competition, § 2(a) of the Robinson–Patman Act "prohibits price discrimination between different purchasers of commodities of like grade and quality 'where the effect of such discrimination may be substantially to lessen competition ... or to injure, destroy, or prevent competition' among the purchasers." *Id.* (quoting 15 U.S.C.A. § 13(a)). "The reasonable possibility of substantially lessening competition ... requir[es] the plaintiff to prove that the result of the price discrimination 'is likely to be a severe, adverse effect on competition.'" *Id.* (quoting *Littlejohn v. Shell Oil Co.,* 483 F.2d 1140, 1144 (5th Cir.1973) (en banc)). Consequently, in order to show a violation of § 2(a), "plaintiff must demonstrate that the likely effect of the alleged price discrimination was to allow a favored competitor to draw significant sales or profits away from him, the disfavored competitor." *Id.* (citations omitted).

S & W, recognizing that in order for there to be discrimination between purchasers violative of § 2(a) " 'there must be actual sales at two different prices to two different actual buyers,' " [7] pursues its Robinson–Patman claim on the basis of the price discrepancy between the two barges of reef shell delivered to Coast on November 7, 1989 at a price of $10.50 per cubic yard,[8] and subsequent sales made to S & W beginning in February of 1990 at a price of

---

7. *M.C. Mfg. Co., Inc. v. Texas Foundries, Inc.,* 517 F.2d 1059, 1065 (5th Cir.1975), *cert. denied,* 424 U.S. 968, 96 S.Ct. 1466, 47 L.Ed.2d 736 (1976) (quoting *Jones v. Metzger Dairies, Inc.,* 334 F.2d 919, 924 (5th Cir.1964), *cert. denied,* 379 U.S. 965, 85 S.Ct. 659, 13 L.Ed.2d 559 (1965)).

8. S & W alleges, and Dravo does not dispute, that the $10.50 price afforded Coast was the direct result of the October 11, 1989 meeting between Allen of Dravo and Fore of Coast. *See supra* at n. 6.

$12.00 per cubic yard. An alternative basis for S & W's Robinson–Patman claim is the price discrepancy between reef shell deliveries made to Coast beginning in February of 1990 at a price of $11.50 per cubic yard, and deliveries made to S & W during that same time period at $12.00 per cubic yard.[9]

Dravo first contends that S & W's comparison of the $10.50 sales price allowed Coast on November 7, 1989 and the $12.00 sales price provided S & W beginning in February 1990 is not a correct comparison for purposes of the Robinson–Patman Act. According to Dravo, since the Act requires at least two actual sales to two actual buyers at different prices at the same proximate point in time, the 1990 deliveries to S & W at $12.00 are not relevant to the November 7, 1989 delivery to Coast at $10.50 because the sales occurred at least three months apart and thus were not at the same proximate point in time. Dravo further argues that even if the comparative analysis were $10.50 versus $12.00, there is still no basis for a finding of unlawful price discrimination since the two barges of shell delivered to Coast at $10.50 were to satisfy outstanding commitments on jobs already secured by Coast. As such, according to Dravo, the lower price charged Coast on those two barges could not have the likely effect of substantially lessening competition between Coast and S & W.

■ The court is of the opinion that it need not determine whether sales occurring approximately three months apart are sufficiently contemporaneous for purposes of Robinson–Patman since the court's conclusion that S & W has failed to demonstrate that the purchases were made "in competition," as required by the Act, is fatal to S & W's Robinson–Patman claim. Discriminatory pricing is violative of Robinson–Patman only when it lessens or tends to prevent competition between customers or between sellers. To constitute a Robinson–Patman wrong, the price discrimination must occur between competitors in comparable transactions— i.e., where persons receiving the different prices are in actual, functional competition with one another—and it must have the requisite effect upon actual or potential competition. Even if sales at different prices are contemporaneous, involve goods of like grade and quality, the price distinction is not justified by good business cause, and it causes injury to the disadvantaged purchaser, recovery under the Act is precluded absent proof that the price variance detrimentally affected competition.

*M.C. Mfg.*, 517 F.2d at 1066 (citations omitted).

In the case at bar, the relevant facts are without dispute. The three jobs which S & W claims it lost as a result of Dravo's delivery of two barges of reef shell to Coast at $10.50—"City of Gulfport," "Forrest Avenue" and "Division Street"—were all bid and obtained by Coast prior to the October 11, 1989 meeting at which Dravo agreed to the $10.50 price. Coast obtained the "City of Gulfport" job on June 6, 1989, the "Forrest Avenue" job on July 11, 1989, and the "Division Street" job on July 18, 1989. Clearly, Coast had the business for supplying shells to those three jobs prior to any alleged discriminatory pricing by Dravo. Nonetheless, S & W attempts to rely on its status as an "alternate bidder" with respect to those three jobs in order to sustain its claim. Specifically, S & W contends that it has

demonstrated a genuine issue of material fact as to what happened had there been no discriminatory prices granted to Coast

---

**9.** S & W received its last 1989 delivery of shell from Dravo on September 27 at a price of $11.00 per cubic yard. On November 7, 1989, Dravo delivered two barges of shells to Coast at a price of $10.50 per cubic yard. No other deliveries were made to S & W or Coast in 1989. In 1990, Dravo made five deliveries of shell to S & W (February 3, April 8, May 25, July 24 and October 20), all at $12.00 per cubic yard. Also during 1990, Dravo made four deliveries of shell to Coast (February 5, March 27, July 25 and October 20), all at $11.50 per cubic yard. According to S & W, both the $1.50 price concession on the November 7, 1989 delivery to Coast (as compared to S & W's 1990 deliveries) and the $.50 price concession given Coast on 1990 deliveries (as compared to S & W's 1990 deliveries) constitute unlawful price discrimination under the Act.

Materials—i.e., that since Coast Materials could not perform its bid with the City of [Gulfport] that [S & W] as the alternate bidder would have performed the bid and suffered damages in the amount of profits it would have made had it been allowed to perform that bid (the same analysis applies to the Forrest Avenue and Division Street projects).

The court, however, concludes otherwise. Although Coast and S & W were competitive *bidders* on the "City of Gulfport," "Forrest Avenue" and "Division Street" jobs, they were not competitive "purchasers" as required by the Act because S & W could have received the business for those three jobs *only* if Coast first defaulted. It was the bids on the three jobs which were in competition, not the subsequent sales assailed here. *See M.C. Mfg.*, 517 F.2d at 1066–68 (both plaintiff and plaintiff's rival were bidding for government contract; rival was low bidder and purchased from defendant; plaintiff and its rival not "purchasers in competition" because only the one winning government contract would buy). These bids alone cannot form the basis for S & W's Robinson–Patman Act claim. *See id.* Once Coast was awarded the bids, and thus became the primary contractor, it was assured of the right to fulfill the shell requirements on all three jobs regardless of any discrepancy in the prices Dravo later charged Coast or any of its competitors, including S & W. The fact that Coast had been awarded the bids prior to the alleged discriminatory pricing meant that Coast and S & W could not have been "in competition" for any of the above described jobs at the time of their purchases, i.e., S & W and Coast were not in "actual, functional competition with one another" with respect to any of these jobs at the time of the alleged unlawful sales. As such, the price discrepancy between the actual purchases could not have diminished S & W's competitive ability in the Gulf Coast shell market since the $10.50 price given Coast to perform jobs already awarded to Coast in no way affected S & W's

ability to bid or obtain other jobs not yet awarded.[10]

Moreover, under Robinson–Patman, " '[i]njury to a competitor is not the test; the test is injury to competition.' " *Id.* (quoting *Lloyd A. Fry Roofing Co. v. F.T.C.*, 371 F.2d 277, 281 (7th Cir.1966)). Injury to competition is usually shown in either of two ways: proof of lost sales or profits. *See Falls City Indus., Inc. v. Vanco Beverage, Inc.*, 460 U.S. 428, 434–35, 103 S.Ct. 1282, 1288, 75 L.Ed.2d 174 (1983); *Rose Confections, Inc. v. Ambrosia Chocolate Co.*, 816 F.2d 381 (8th Cir. 1987). In the case *sub judice*, S & W has not produced any direct evidence of lost sales or profits caused by discriminatory pricing. S & W merely supposes or speculates that had Dravo not afforded Coast the $10.50 price, Coast would have defaulted on the "City of Gulfport," "Forrest Avenue" and "Division Street" jobs, thus enabling S & W to obtain those jobs as an "alternate bidder." The court finds, however, that such proof as to the hypothesized effect of Dravo's one-time sale to Coast at $10.50 is not sufficient to show an injury to competition generally or that speculative revenue lost from Coast's not defaulting on the three above described jobs, in which S & W was nothing more than an "alternate bidder," impaired its individual competitive status. *Chrysler Credit*, 670 F.2d at 581. Indeed, none of the sales S & W allegedly lost because of Dravo's price discrimination can be causally linked to price preferences afforded Coast. On this point, the law in this circuit is clear: "[S & W] must demonstrate that the likely effect of the alleged price discrimination was to allow a favored competitor [, Coast,] to draw significant sales or profits away from [S & W], the disfavored competitor." *Id.* at 580. " 'Essentially, we have in the particular situation an analogue to standing. [S & W] has standing only to raise and compare those sales which are injurious to [its] competition.' " *M.C. Mfg.*, 517 F.2d at 1066 n. 15 (quoting *Mayer*

**10.** For example, during the same time period in which S & W contends Dravo's pricing prohibited it from competing with Coast in the Gulf Coast reef shell market, S & W underbid Coast and obtained as low bidder an August 1990 City of Gulfport reef shell contract.

*Paving & Asphalt Co. v. General Dynamics Corp.*, 486 F.2d 763, 770 (7th Cir.1973), *cert. denied*, 414 U.S. 1146, 94 S.Ct. 899, 39 L.Ed.2d 102 (1974)). As discussed above, the court concludes that S & W cannot rely on its status as an "alternate bidder" to establish a causal relationship between the two barges of shell sold to Coast at $10.50 per cubic yard and sales allegedly lost because of Coast's not defaulting on the three jobs awarded to Coast *prior* to any discriminatory pricing. Such contentions are too attenuated and speculative to satisfy the injury to competition requirement of the Act; therefore S & W does not have standing to complain of Dravo's sales to Coast for the "City of Gulfport," "Forrest Avenue" and "Division Street" jobs as a basis for its Robinson–Patman claim. *See id.* at 1066 n. 15.

With respect to other sales allegedly lost as a result of lower prices afforded Coast, S & W has produced no evidence linking the discriminatory prices to sales or jobs obtained by Coast at the expense of S & W. Dravo sold shell of "like grade and quality" at different prices to S & W and Coast.[11] However, the Act does not outlaw price discrimination *per se,* but only price discrimination which presents a reasonable probability that competition will be substantially lessened or injured. *FTC v. Anheuser–Busch, Inc.*, 363 U.S. 536, 542–43, 80 S.Ct. 1267, 1270–71, 4 L.Ed.2d 1385 (1960); *Chrysler Credit*, 670 F.2d at 580–81. S & W must show that the $.50 price difference from February through October 1990 sufficiently harmed competition.

> [I]t is essential to the establishment of the violation [of the Act] ... that there be a causal relationship between the price discrimination to the favored customer[ ] and the factor relied upon as evidencing an actual or reasonable probable substantial lessening of ability to compete on the part of the unfavored customer[ ].

*American Oil Co. v. FTC*, 325 F.2d 101, 104 (7th Cir.1963), *cert. denied*, 377 U.S. 954, 84 S.Ct. 1631, 12 L.Ed.2d 498 (1964).

The record in this matter reveals that Coast did not provide shells to any of the jobs (other than the three described above) identified by S & W as having been lost to Coast as a result of Dravo's discriminatory pricing. The unsupported deposition testimony of S & W's owner/president (Ms. Johnson) and yard superintendent (Mr. Ratcliff) spoke only of their assumed belief that sales on those jobs were lost to Coast. Both Johnson and Ratcliff acknowledged that they did not know who the material supplier was on any of the jobs S & W claimed to have lost due to price discrimination, or whether Dravo's prices to Coast actually caused S & W to lose business.

When considered in light of Dravo's own proof—including the affidavit of its comptroller showing that the only jobs identified by S & W on which Coast provided shells were the "City of Gulfport," "Forrest Avenue" and "Division Street" jobs—S & W's speculative and unsupported testimony in this case is legally insufficient to support a finding of unlawful price discrimination. There has been no direct evidence presented that the lower prices received by Coast were the cause of S & W's failure to obtain any of the jobs allegedly lost because of Dravo's discriminatory pricing. In other words, S & W has failed to demonstrate, as required by the Act, "that the likely effect of the alleged price discrimination was to allow [Coast] to draw significant sales or profits away from [it]." *Chrysler Credit*, 670 F.2d at 580. Since the court must therefore conclude that S & W has not met its burden of coming forward with sufficient evidence suggesting Dravo's pricing was "likely [to cause] a severe, adverse effect on competition," S & W cannot avail itself of the protection of Robinson–Patman. *Id.*

In considering the degree of likely impact on competitive strength, the court can-

---

11. As with the price discrepancy between the two barges delivered to Coast on November 7, 1989 at a price of $10.50 per cubic yard and subsequent deliveries to S & W in 1990 at $12.00, Dravo does not dispute 1990 deliveries to Coast at $11.50 per cubic yard and deliveries to S & W during that same time period at $12.00. *See supra* at n. 9.

**1222**

not ignore the actual facts of the case. As the Fifth Circuit stated in *Chrysler Credit:*

> Courts must be careful in each case to distinguish between price differences which cause anticompetitive effects and those which reflect "a desirable response to competition and considerations of efficiency." Cooper, *Price Discrimination Law and Economic Efficiency*, 75 Mich. L.Rev. 962, 969 (1977). As the Supreme Court stated in *FTC v. Sun Oil Co.*, 371 U.S. 505, 527, 83 S.Ct. 358, 370–71, 9 L.Ed.2d 466 (1963), "In appraising the effects of any price cut or the corresponding response to it, ... courts must make realistic appraisals of relevant competitive facts."

*Chrysler Credit*, 670 F.2d at 580.

■ The actual competitive facts of this case do not indicate that an adverse effect on competition was a reasonably probable result of discriminatory pricing. The sale to Coast of two barges of shell in November 1989 at a $1.50 price difference was an isolated incident of limited duration in connection with Coasts' need to honor prior commitments on jobs already bid and awarded to Coast. Dravo's one-time $1.50 price allowance simply cannot be construed as establishing a reasonable possibility of severe, adverse effect on competition. "[T]here must be something more than an essentially temporary minimal impact on competition." *American Oil*, 325 F.2d at 106; *see also International Film Ctr., Inc. v. Grayflex, Inc.*, 427 F.2d 334, 335–36 (3d Cir.1970); *Schaben v. Samuel Moore & Co.*, 462 F.Supp. 1321, 1331 (S.D.Iowa), *aff'd*, 606 F.2d 831 (8th Cir.1979). "The protection intended to be afforded by the statute is directed to the preservation of *competition*. The statute's concern with the individual *competitor* is but incidental." *American Oil*, 325 F.2d at 104.

S & W's reliance on *FTC v. Morton Salt*, 334 U.S. 37, 68 S.Ct. 822, 92 L.Ed. 1196 (1948), and its progeny is not relevant to the facts as developed in the case *sub judi-*

ce. *Morton Salt* upheld an inference of likely injury from the fact of substantial price differences granted to market leaders in a highly competitive market in which minor price differences significantly affected competitors' low profit margins. S & W's proof as provided in its response to Dravo's motion established hardly any of these elements. As discussed above, the one-time $1.50 price allowance on two barges delivered to Coast in November 1989 to cover prior commitments was an isolated incident of limited duration, and therefore does not come within the *Morton Salt* rule. With regard to the $.50 price discrepancy on 1990 deliveries to Coast and S & W, the court notes that this price differential constituted only a four percent advantage which continued for only five transactions over a nine-month period.[12] Furthermore, the record reveals that S & W's own yard superintendent, Ratcliff, draws sharp contrasts between the operations of S & W and Coast. Ratcliff describes S & W as operating with low overhead while Coast possesses a much greater overhead since it runs a fleet of trucks and maintains a substantial payroll. Unlike S & W, which operates with personnel consisting of three employees and, as of March 30, 1990, owned equipment with a book value of $6,636.69, Coast maintains a multi-million dollar physical plant and payroll of forty-nine employees.[13] Indeed, nothing in the record suggests facts which would bring this case within the ambit of *Morton Salt* and its progeny. The facts in this case simply do not warrant any reasonable prospect of a substantial lessening of competition as a result of the price discrimination alleged.[14]

In sum, S & W's response to Dravo's motion, including the affidavits and deposition excerpts submitted to the court, is inadequate to show that alleged sales to Coast at discriminatory prices were likely to lessen competition substantially or prevent S & W from bidding or competing

---

**12.** *See supra* at n. 9.

**13.** Dravo's former sales representative for the Gulf Coast area, Mr. Bell, describes Fore's depiction of S & W as "operating out of a pick-up

truck" at a cost level with which Coast cannot compete.

**14.** *See supra* at n. 10.

with Coast for reef shell sales in the Gulf Coast area. The court therefore finds that in the face of Dravo's properly supported motion, as well as the actual facts as developed in both parties' motions, S & W's conclusory contentions of sales lost to Coast are not sufficient to dispose of its burden of setting forth *"specific facts"* showing that there is a genuine issue for trial with regard to the requisite reasonable possibility of severe, adverse effect on competition. *See* Fed.R.Civ.P. 56(e).

The court must next consider, as a basis for S & W's Robinson–Patman claim, S & W's contentions that it lost numerous sales due to Dravo's alleged refusals and delays in delivering shell to S & W, and its failure to provide S & W with price quotes. It is well established that "[t]he Robinson–Patman Act prohibits direct and indirect price discrimination and nothing more." *L & L Oil Co., Inc. v. Murphy Oil Corp.*, 674 F.2d 1113, 1121 (5th Cir.1982). A seller cannot violate § 2(a) unless it has sold similar commodities to at least two different purchasers. "The term 'purchaser' means a buyer or vender, not one who merely seeks to purchase." *M.C. Mfg.*, 517 F.2d at 1065 n. 11 (citations omitted). Thus, alleged refusals to deal or supply are not actionable, even if such refusals are discriminatory. *Id.* at 1120–21; *Shaw's, Inc. v. Wilson–Jones Co.*, 105 F.2d 331, 333 (3d Cir.1939); *Cemar, Inc. v. Nissan Motor Corp.*, 678 F.Supp. 1091, 1102 (D.Del.1988); *Reliable Tire Dist., Inc. v. Kelly Springfield Tire Co.*, 592 F.Supp. 127, 132 (E.D.Penn.1984). Moreover, discriminatory price quotes or offers to sell at discriminatory prices are likewise not actionable. *See, e.g., Chatham Brass Co. v. Honeywell, Inc.*, 512 F.Supp. 108, 113–14 (S.D.N.Y.1981); *J.W. Burress, Inc. v. JLG Indus., Inc.*, 491 F.Supp. 15, 17–19 (W.D.Va.1980). The court therefore finds these claims insuffi-

cient as a matter of law to sustain S & W's Robinson–Patman claim.[15]

## IV. ANTITRUST INJURY

The Supreme Court made clear in *Brunswick Corp. v. Pueblo Bowl–O Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977), that the antitrust laws do not provide a private damages remedy for all losses traceable to conduct violating the antitrust laws; they only provide for losses that are part of the anticompetitive effect of such conduct. Thus, to recover treble damages under § 4 of the Clayton Act for an alleged violation of § 2(a) of the Robinson–Patman Act, a plaintiff "must, of course, be able to show a causal connection between the price discrimination in violation of the Act and the injury suffered." *Perkins v. Standard Oil Co.*, 395 U.S. 642, 648, 89 S.Ct. 1871, 1874, 23 L.Ed.2d 599 (1969). "[Plaintiff] must prove more than a violation of § 2(a), since such proof establishes only that injury *may* result." *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 562, 101 S.Ct. 1923, 1927, 68 L.Ed.2d 442 (1981).

In accordance with these Supreme Court cases, the Fifth Circuit has held:

> In a treble damages suit under the Robinson–Patman Act a plaintiff must not only prove a violation of the Act, he must also demonstrate antitrust injury by a preponderance of the evidence. In addition, he must do so "as a matter of fact and with a fair degree of certainty." Conclusory statements by the plaintiff, without evidentiary support, as to the fact of damage caused by the alleged antitrust violation are not sufficient. Evidence of a slight decrease in market share roughly coincident with the alleged violation is not sufficient either. The plaintiff must put forth substantial evi-

---

**15.** S & W's amended complaint does not specifically allege discriminatory provision of a "service or facility" violative of § 2(e) of the Robinson–Patman Act, 15 U.S.C. § 13(e). The complaint does allege, however, discrimination "with respect to the furnishing of delivery services." Any attempt to proceed under § 2(e) would in any event be inappropriate here since

"'delivery' is not a 'service or facility' within the meaning of the Act." *L & L Oil Co.*, 674 F.2d at 1121. Moreover, "the method of delivering a product to a customer is not sufficiently connected to the customer's resale of the product to bring delivery within the coverage of § 2(e)." *Id.*

dence. If he fails to do so, the defendant is entitled to a directed verdict.

*Chrysler Credit*, 670 F.2d at 581–82 (citations omitted).

█ In an attempt to show antitrust injury in compliance with the above standards, S & W contends that "the loss of direct sales on the City of [Gulfport], Forrest Avenue, and Division Street jobs satisfies the more stringent requirement for treble damages contained in Section 4 of the Clayton Act." As the court has discussed above, S & W's reliance on its status as merely an "alternate bidder" with respect to these three jobs, in which Coast was actually awarded the bid, is not sufficient to show either the likely or actual injury attributable to the lower price afforded Coast three to four months *after* Coast had secured the jobs. It can hardly be reasonably contended that this showing demonstrates "as a matter of fact and with a fair degree of certainty" that the alleged price discrimination *caused* S & W to *lose* any of the three jobs. *Id.* Indeed, S & W never had these jobs. Coast had the business prior to any alleged discriminatory pricing by Dravo. The court therefore finds that S & W's attempt to establish antitrust injury based upon its status as an "alternate bidder" on the three above-described jobs is much too attenuated and speculative to meet the stringent requirements of § 4 of the Clayton Act.

█ Furthermore, with respect to S & W's allegations concerning other jobs or sales lost as a result of Dravo's pricing, the court concludes, as it did in regard to the alleged violation of § 2(a), that S & W has advanced nothing more than conclusory allegations without *any* evidentiary support of actual sales or jobs lost to Coast.[16] Dravo, on the other hand, has presented specific proof demonstrating that Coast did not provide shells to any other jobs identified by S & W (in responses to interrogatories) as being lost to Coast because of Dravo's alleged unlawful pricing. Clearly, S & W

16. In fact, aside from the "City of Gulfport," "Forrest Avenue" and "Division Street" jobs, S & W's brief in response to Dravo's motion does not even address any other jobs or sales allegedly lost because of discriminatory pricing, much

has not put forth substantial evidence showing that any prices given to Coast allowed it to draw any sales or profits away from S & W, i.e., there is no "causal connection." *See Perkins, supra.* Therefore, even if the court were to find that S & W can establish a prima facie Robinson–Patman violation, Dravo is nonetheless entitled to summary judgment. For the reasons discussed above, the court concludes that S & W cannot show antitrust injury; and to recover damages under § 4 of the Clayton Act, S & W must prove "cognizable injury attributable to the [antitrust] violation." *Olympia Co. v. Celotex Corp.*, 771 F.2d 888, 891–92 (5th Cir.1985).

## V. S & W'S STATE LAW CLAIMS

S & W contends that "[it] is entitled to recover under [Mississippi law] upon proof that [Dravo] intentionally and improperly interfered with [its] existing or prospective contracts, including [its] business relations." S & W bases this common law claim on the same allegations of unlawful discriminatory pricing and delivery practices. According to S & W, "the use of improper means, such as conspiracy or violation of law (i.e., price fixing in violation of the Robinson–Patman Act), renders an intentional interference with both prospective and existing contracts actionable, no matter what the motive for the interference."

Mississippi law does recognize an action for malicious interference with business relations. To establish such a claim, a plaintiff must prove:

1) that the acts were intentional and willful; 2) that they were calculated to cause damage to the plaintiffs in their lawful business; 3) that they were done with the unlawful purpose of causing damage and loss, without the right or justifiable cause on the part of the defendant (which constitutes malice); and 4) that actual damage and loss resulted.

less establish the required causal connection between Dravo's pricing and Coast's procurement of any jobs or sales at the expense of S & W.

*Galloway v. Travelers Ins. Co.*, 515 So.2d 678, 682–83 (Miss.1987) (citations omitted).

 As noted above, S & W bases its tortious interference with business claim in part on its Robinson–Patman allegations. Specifically, S & W contends that "Dravo improperly interfered with [S & W's] prospective contracts by causing [S & W] to incur an additional, minimum, fifty cent of profit upon each sale by [S & W]." The court concludes, however, that the failure of S & W's Robinson–Patman claim along with S & W's reliance on Coast demands, as opposed to Dravo agreements, precludes a finding of Dravo's tortious interference with S & W's business.

The record in this matter simply does not establish design or motive on the part of Dravo to drive S & W out of business. To the contrary, the record abounds with evidence of Dravo's continuation of a voluntary business relationship with S & W after the October 11, 1989 meeting between Dravo and Coast. Furthermore, as discussed in regard to S & W's Robinson–Patman claim, the $10.50 price for the two barges of shell delivered to Coast in November of 1989 was a one-time transaction to cover Coast's prior commitments. The former employee of Dravo covering the Gulf Coast area (Bell) acknowledged that he, and Dravo, when implementing a price increase generally honored customer reliance on existing prices. In fact, after the July 1, 1989 announced price increase, *see supra* at n. 6, S & W itself received four barges of reef shell at prices below the announced price of $12.00.[17]

The only record suggestion of any desire on behalf of Dravo to run S & W out of business is Bell's description of one aspect of Coast's demand for price relief during the October 1989 meeting. Bell does testify that Coast sought a $2.00 to $3.00 price preference to help it run its competition out of business. Bell further states, however, that Allen of Dravo did not agree to such a price difference. Other portions of the record also reveal that Dravo, in fact, never granted nor acquiesced to Coast's $2.00 to $3.00 price reduction request. The $11.50 price given to Coast on 1990 deliveries did not approach the $2.00 to $3.00 reduction requested by Coast. Nothing in the record suggests that the $.50 differential in prices charged Coast and S & W during 1990 could have been intended to or had the effect of driving S & W out of business.[18]

As additional support for its common law tortious interference claim, S & W asserts that "Dravo's refusals to deal and its slowing down of deliveries in furtherance of the conspiracy [between Dravo and Coast to run S & W out of business] resulted in direct damage to [S & W] in terms of lost profits." Although S & W relies upon a comparison of post-October 11, 1989 deliveries to both Coast and S & W, which show Coast receiving 18,243.06 cubic yards of reef shell as compared to S & W's 11,471.-54, the court cannot overlook the fact that S & W received more reef shell than Coast in both 1989 and 1990.[19] By S & W's own acknowledgement and as confirmed by actual deliveries during 1990, Dravo equitably allocated shell deliveries among S & W, Coast, and one other Gulf Coast dealer

**17.** On July 21, 1989, S & W received two barges of reef shell priced at $10.00, while on September 27, 1989, it received two more barges priced at $11.00.

**18.** S & W necessarily concedes the $.50 differential between S & W's $12.00 price and Coast's $11.50 price is not recoverable under its Robinson–Patman claim. *See, e.g.,* Page, *Optimal Antitrust Penalties and Competitors Injury,* 88 Mich.L.Rev. 2151 (June 1990). S & W does assert, however, that it is entitled to recover a $.50 diminution in profits under state law. S & W cites no authority for this broad contention.

The court is of the opinion that this unsupported contention is incorrect. S & W has no

common law right to receive the same price as Coast. S & W's state law claim is for "intentional interference with both prospective and existing contracts." Yet, S & W has made no showing as to either Dravo's malicious procurement of a third party's failure to perform or enter into a business relationship with S & W, or that the $10.50 price afforded Coast interfered with any S & W business relationship.

**19.** S & W's 1989 deliveries totalled 13,611.56 cubic yards as contrasted with Coast's 8,313.14 yards, while in 1990 S & W received 11,471.54 cubic yards as compared to Coast's 11,385.71 yards.

(Tally).[20] The court therefore concludes that S & W's unsupported allegations are insufficient to sustain its common law claim when compared with Dravo's actual delivery practices.

 Moreover, as discussed *supra,* S & W sustained no antitrust injury as the result of Dravo's alleged unlawful price discrimination. For purposes of its state law claim, the court likewise finds that S & W sustained no actual damage because of Dravo's alleged interference with business relations through malicious pricing and delivery practices. The previous discussion concerning antitrust injury demonstrates that S & W cannot prove any lost sales or business attributable to the preferential prices afforded Coast. Thus, S & W cannot show that the prices allegedly calculated to cause S & W damage had any such intended effect. Furthermore, S & W's assertions that Dravo maliciously refused to quote prices or deliver shell are totally unsupported and speculative as to any actual damage resulting therefrom.[21] Such speculative and unsupported assertions are not sufficient to withstand Dravo's motion for summary judgment. While absolute precision is not required, S & W nonetheless bears the burden of proving damage to some reasonable degree of certainty. *See, e.g., Ross v. Deposit Guaranty Nat'l Bank,* 400 F.Supp. 45, 52 (S.D.Miss.1974); *Kaiser Inv. v. Linn Agriprises,* 538 So.2d 409, 415 (Miss.1989). Therefore, even assuming malicious purpose, S & W's inability to make an adequate showing on this essential element of its prima facie case necessitates summary judgment for Dravo. *See, e.g., Galloway,* 515 So.2d at 683–84.

## VI. DRAVO'S COUNTERCLAIM

In the agreed pre-trial order it is established as an undisputed fact that "[o]n October 20, 1990, Dravo delivered 1,558.46 cubic yards of shell to S & W at an agreed price of $18,701.52. S & W accepted delivery of the shell. S & W has not paid for the shell." S & W's only defense to Dravo's counterclaim for recovery of this amount is that it is entitled to setoff based upon its claims against Dravo. According to S & W, any recovery under the counterclaim must therefore await the jury trial. Since the court has determined that Dravo is entitled to judgment as a matter of law as to all claims asserted by S & W, there is no possibility of attempted setoff and thus Dravo is entitled to judgment on its counterclaim in the amount of $18,701.52 with prejudgment interest running from the payment due date, December 1, 1990. *See, e.g., Western Line Consolidated School Dist. v. Continental Casualty Co.,* 632 F.Supp. 295, 305–06 (N.D.Miss.1986).

## VII. CONCLUSION

Based on the foregoing, it is ordered that defendant's motion for summary judgment is granted both as to all claims asserted against it and as to its counterclaim.

A separate judgment will be entered in accordance with Rule 58 of the Federal Rules of Civil Procedure.

ORDERED.

---

**20.** On February 3, 1990, Dravo delivered a barge of reef shell each to S & W, Coast and Tally. On March 27, 1990, it delivered two barges to Coast, while on April 8 Dravo delivered two barges to S & W and on May 24 a barge each to S & W and Tally without any additional deliveries to Coast. On July 24, 1990, and October 20, 1990, Dravo again delivered shell to S & W, Coast and Tally. No one on the Mississippi Gulf Coast has received any shell from Dravo since October 1990.

**21.** S & W's alleged inability to obtain price quotes from Dravo "until it was too late … to bid in competition with Dravo on the Vicksburg Corps of Engineers Project" does not provide a sufficient damage predicate to sustain S & W's state law claim. It is speculative both as to what price Dravo allegedly would or should have quoted S & W for this job, and as to whether S & W would have successfully outbid the shell producer who bid and obtained the job. Moreover, according to Dravo, it could not even bid the job itself because it could not supply the shell.