**KRAFT GENERAL FOODS, INC.
and Kraft General Foods
Argentina, S.A.**

v.

**BC–USA, INC. d/b/a Bongrain
Cheese U.S.A.**

Civ. No. 93–4659.

United States District Court,
E.D. Pennsylvania.

Dec. 23, 1993.

---

Ethan Horwitz, Amy Benjamin Jacka, of Darby & Darby, New York City, Martin J. Black, of Dechert, Price & Rhoads, Philadelphia, PA, for plaintiffs.

Robert V. Vickers, of Body, Vickers & Daniels, John S. Summers, of Hangley, Connolly, Epstein, Chicco, Foxman & Ewing, Cleveland, OH, for defendant.

## MEMORANDUM AND ORDER

DITTER, Senior District Judge.

Before me is a case concerning alleged trademark infringement in the marketing and sale of cream cheese. The plaintiffs, manufacturers of Philadelphia brand cream cheese, seek to enjoin the defendant from using the name "Pennsylvania" in connection with the advertising, promotion or sale of any cream cheese, cheese, or food product that does not originate with the plaintiffs. For the reasons set forth below, plaintiffs' motion is GRANTED.

## I. FACTS

Kraft General Foods ("Kraft"), a Delaware corporation, has sold Philadelphia brand cream cheese in the United States for over 100 years. After studying consumer acceptance of cream cheese in Argentina, Kraft recently introduced its brand of cream cheese to the Argentine market.

Kraft has a registered Argentine trademark for "Philadelphia" and "Philadelphia Brand"[1] and has pending registrations for "Philadelphia (and design)", "Soft Philadelphia" and "Philly." Kraft first shipped its cream cheese to Argentina for sale there in April, 1993. Sales began in May, 1993.

In Brazil and Uruguay, Kraft owns the trademark registrations for "Philadelphia Brand" and "Philly." Its registrations for "Philadelphia" are pending in both countries.

Kraft has been selling its cream cheese directly in Brazil since the summer of 1991. Kraft does not yet sell its cream cheese directly to Uruguay, but expects to by January, 1994.

Bongrain Cheese U.S.A. ("Bongrain"), also a Delaware corporation, has two South American affiliates relevant to this case: Santa Rosa, Bongrain's Argentine affiliate, and Polenghi, Bongrain's Brazilian affiliate. Both Santa Rosa and Polenghi are well-known cheese manufacturers and distributors in their respective countries. Bongrain packs its cream cheese in New Holland, Pennsylvania, for both Santa Rosa and Polenghi.

Santa Rosa has a pending trademark registration for "Pennsylvania" in Argentina, while Polenghi has a pending trademark registration for "Pennsylvania" in Brazil. Bongrain, Santa Rosa, and Polenghi do not sell Pennsylvania brand cream cheese in the United States. In April/May, 1993, Santa Rosa began selling Pennsylvania brand cream cheese in Argentina. Polenghi began selling the cream cheese in Brazil in July/August, 1993.

## II. OBJECTIONS RESERVED FROM PRELIMINARY HEARING

### A. Roberto Moure as an Expert Witness

■ At the preliminary injunction hearing, defendant introduced the testimony of Roberto Moure, an intellectual property agent from Argentina. Moure has over 30 years' experience as an agent and has 22 years' experience rendering opinions on infringement. He keeps abreast of the relevant legal issues by reviewing Argentine trademark law, regulations, and verdicts. Moure's testimony on direct examination addressed the reputation of the longstanding Santa Rosa trademark, which is part of the Pennsylvania brand cream cheese package. He also discussed the Argentine registration of both the Pennsylvania and Philadelphia trademarks. Finally, he stated that, in his opinion, the two marks are not confusingly similar, that Argentine consumers will not be confused, and

---

1. It is the plaintiffs' position that "Philadelphia Brand" and "Philadelphia" mean the·same thing. (transcript, p. 22). I will use "Philadel- phia" and "Philadelphia brand" interchangeably when referring to the cream cheese made by Kraft.

that a lawsuit by Kraft against Santa Rosa in Argentina would likely fail.

On cross examination, plaintiffs established that Moure is not an attorney and that an intellectual property agent is different from an intellectual property attorney. They also established that Moure does not give trademark infringement opinions by himself, but rather, only with attorneys. After completing their cross examination, plaintiffs moved to strike Moure's testimony, contending that Moure is not an expert on Argentine trademark law. They relied on the fact that Moure is not an attorney and would not be able to give an infringement opinion in Argentine courts. I sustained the plaintiffs' motion to strike for the time being and allowed the parties to submit additional material on the issue.

After reconsidering this question, I have decided that Moure is qualified to provide opinions and to admit his testimony regarding Argentine trademark law. Federal Rule of Evidence 702 reads,

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto....

■ The Third Circuit recognizes a liberal qualification standard for experts under this Rule. *Hines v. Consolidated Rail Corp.*, 926 F.2d 262, 272 (3d Cir.1991). A specific degree or type of training is not necessary for a witness to be an expert in a certain area. *Genty v. Resolution Trust Corp.*, 937 F.2d 899, 917 (3d Cir.1991) (trial court's exclusion of witness, doctor of toxicology, simply because he did not possess a medical degree, is inconsistent with expert witness jurisprudence); *In re Paoli R.R. Yard PCB Litig.*, 916 F.2d 829, 856 (3d Cir.1990) (district court abused its discretion in excluding witness' testimony on grounds that she is neither chemist nor medical doctor). Rather, various kinds of knowledge, skill, experience, training or education can qualify an expert in a certain area. *Hines*, 926 F.2d at 273.

Moure is similar to the expert witness in *N.V. Maatschappij Voor Industriele Waar-* *den v. A.O. Smith Corp.*, 590 F.2d 415 (2d Cir.1978). In *N.V. Maatschappij,* the trial court refused to allow a Canadian patent expert to give his opinion regarding patent infringement under Canadian law because he was not a patent lawyer and could not, under Canadian law, render his infringement opinion in a Canadian court. *Id.* at 418. The Second Circuit agreed with the appellant that the witness had considerable experience and that neither his lack of formal training in patent law nor his incompetency to testify in Canadian courts should have barred his giving an infringement opinion in the district court. *Id.* at 418–419. Rather, the court said, a foreign patent expert is free to testify before federal courts in this country as long as the expert's credentials satisfy the Rule 702 standards for qualification. *Id.*

Moure has many years of experience in the field of Argentine trademark law even though he has not been educated as a trademark attorney. He has worked with trademark attorneys in rendering infringement opinions and, as an experienced trademark agent, gives his opinion on infringement to clients even though he may not represent his clients in Argentine courts. The plaintiffs' witness, Fernando Noetinger, testified that Moure is a qualified trademark agent and, as such, would know something about Argentine trademark law. I find that Moure qualifies as an expert by virtue of his knowledge and experience, despite his lack of formal legal education in trademark law.

### B. Admission of Anecdotal Evidence of Confusion

■ During the direct examination of Jorge Bertran–Guzman, Kraft Argentina's General Manager of Business Affairs, Kraft sought to introduce evidence of actual customer confusion. (Transcript, pp. 62–64). Bertran recounted his observations of customers in an Argentine supermarket choosing packages of both Philadelphia brand and Pennsylvania brand cream cheese, or choosing Pennsylvania brand and then returning to exchange it for Philadelphia brand. Bertran reported that one customer told him that he thought the two brands were different versions made by the same company.

Another customer said that he had picked up the Pennsylvania packages by mistake because the two brands were on the same shelf and both had silver packaging. Bertran also testified that Kraft's distributors and promoters had reported instances of consumer confusion during in-store supermarket sampling. (Tr., pp. 63–65). Bongrain objected to the evidence on the ground that it is hearsay. Plaintiffs argued that the examples are not hearsay because they are not being introduced to prove the truth of the matter asserted. In the alternative, plaintiffs argued, the examples are admissible under the state of mind exception to the hearsay rule as reflecting the confusion of the consumers. I reserved ruling on the motion to strike.

I now hold that Bertran's testimony about customers he observed and their statements to him are admissible under the state of mind exception to the hearsay rule. The statements to Bertran by Kraft's sampling and marketing consultants, concerning consumers' statements to the consultants, are inadmissible hearsay.

Under Federal Rule of Evidence 803(3), statements otherwise excludable as hearsay are admissible if they show the declarant's then-existing state of mind. The declarant's state of mind must be relevant to the case. *Morris Jewelers, Inc. v. General Elec. Credit Corp.*, 714 F.2d 32, 34 (5th Cir.1983) (customers' letters and verbal statements to plaintiff indicating customers' angry state of mind admissible under state of mind exception because angry state of mind was core of case). Numerous courts have admitted evidence of instances of customer confusion in trademark infringement cases. *Armco, Inc. v. Armco Burglar Alarm Co., Inc.*, 693 F.2d 1155, 1160 n. 10 (5th Cir.1982) (testimony by plaintiff's employees of customers calling for burglar alarm company admissible to show actual confusion); *Arachnid, Inc. v. Medalist Mktg. Corp.*, 1991 WL 501962, 1991 U.S.Dist. LEX-IS 9055, *8 (W.D.Wash.1991) (evidence of customers attempting to order defendant's conversion kit from plaintiff admissible to show customers' confused state of mind), *aff'd*, 972 F.2d 1300 (Fed.Cir.1992); *Freddie Fuddruckers, Inc. v. Ridgeline, Inc.*, 589 F.Supp. 72, 76 (N.D.Tex., 1984) (company

president's testimony about statements of the public admissible to demonstrate customers' confused state of mind), *aff'd*, 783 F.2d 1062 (5th Cir.1986); *see also Fuddrucker's, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 845 (9th Cir.1987) (plaintiff's witness testified that customers inquired 100 times a week if plaintiff's and defendant's restaurants had the same owners); *Scandia Down Corp. v. Euroquilt, Inc.*, 772 F.2d 1423, 1431 (7th Cir.1985) (Scandia employees testified to many incidents in which customers mistook plaintiff for defendant), *cert. denied*, 475 U.S. 1147, 106 S.Ct. 1801, 90 L.Ed.2d 346 (1986).

The likelihood of customer confusion is a key element in establishing the likelihood of success on the merits, which is necessary to obtain a preliminary injunction. Bertran testified that one customer told Bertran that he had picked up the Pennsylvania package by mistake. (Tr., p. 62). Another customer told Bertran that he bought both brands because he thought one was a low calorie version made by the same company. (Tr., p. 63). This testimony is admissible under the 803(3) exception because it is indicative of the customers' then-existing confused state of mind.

However, Bertran's testimony that ARPRO, Kraft's sampling consultant, reported customer confusion, is inadmissible hearsay. (Tr., pp. 64–65). Bertran sought to testify about reports made to him by ARPRO employees indicating that customers had told the ARPRO employees of their confusion between the two brands of cream cheese. This testimony by Bertran is not indicative of the ARPRO personnel's state of mind, but rather the state of mind of third parties. *Armco, Inc.*, 693 F.2d at 1160 n. 10 (trial judge should not have permitted witness to testify that plaintiff's answering service had received calls inquiring about defendant); *Programmed Tax Sys., Inc. v. Raytheon Co.*, 439 F.Supp. 1128, 1131 n. 1 (S.D.N.Y.1977) ("[I]nsofar as any declarant was informing [witness] about the state of someone else's mind, ... the state-of-mind exception would not be available").

The findings that follow are based upon accepting Moure's testimony in its entirety and Bertran's testimony in part.

### III. MOTION FOR PRELIMINARY INJUNCTION

In deciding whether to issue a preliminary injunction, a court must consider four factors: the likelihood of plaintiff's success on the merits, the extent of irreparable harm to the plaintiff, the extent to which defendants will suffer irreparable harm if the preliminary injunction issues, and the public interest. *Opticians Ass'n v. Independent Opticians of Am.*, 920 F.2d 187, 191–92 (3d Cir. 1990).

#### A. Likelihood of Success on the Merits

A plaintiff must establish three things in order to prevail in a trademark claim: that the mark is valid and legally protectable, that the plaintiff owns the mark, and that the defendant's use of the mark is likely to cause confusion. *Opticians Ass'n*, 920 F.2d at 192.

The first two prongs are not seriously contested. Kraft owns the trademark registration for "Philadelphia Brand" in Argentina, Brazil, and Uruguay and has other related trademarks pending. The term "Philadelphia" in Kraft's trademark is valid and, as discussed below, is legally protectable as a geographic term used arbitrarily.

In analyzing the third prong, likelihood of confusion, I must consider many factors: the strength of the claimant's mark; the care and attention paid by the consumer in buying the particular product; the defendant's intent in adopting its mark; marketing channels; the similarity of sight, sound, and meaning of the two marks; and evidence of confusion. *See Interpace Corp. v. Lapp, Inc.* 721 F.2d 460, 462–63 (3d Cir.1983); *Estate of Presley v. Russen*, 513 F.Supp. 1339, 1366 (D.N.J.1981).

The strength of the mark is determined by placing it in one of four categories on the spectrum of distinctiveness. *A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 296 (3d Cir.1986). Strong, distinctive marks automatically qualify for trademark protection. An arbitrary or fanciful term is one that is neither logically nor suggestively related to the goods' actual characteristics. A suggestive term suggests rather than describes the characteristics. A descriptive term describes a characteristic or ingredient of the product.

A generic term, finally, is the common descriptive name of the product class. If deemed arbitrary or suggestive, the mark is distinctive and automatically qualifies for protection. 1 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 11:02 (3d ed. 1992). If considered descriptive, the mark is not inherently distinctive and is protected only where claimant has proven secondary meaning. If the mark is generic, it warrants no trademark protection because competitors cannot be deprived of the right to call an article by its name.

The trademark at issue in this case is "Philadelphia," a geographic designation. A term that is descriptive of the geographic location of origin of goods is not inherently distinctive, i.e. arbitrary or suggestive, and is usually protected only upon proof that it has acquired secondary meaning. If the geographic term is used in an arbitrary manner, however, taking into account the type of goods involved, then no secondary meaning is required. 1 McCarthy, § 14:03.

*McCarthy on Trademarks* suggests three relevant questions to aid in determining if a geographic term is used arbitrarily. First, is the mark the name of the place or region where the product is produced? If not, the mark is probably arbitrary. Philadelphia brand cream cheese is made in Philadelphia, but in the small city of Philadelphia, New York, and not in the more obviously recognized city of Philadelphia, Pennsylvania. Second, is the geographic term likely to denote to reasonable buyers that the goods come from the place named? If not, this is another indicative of arbitrariness. Philadelphia is likely to suggest to buyers that the cream cheese comes from Philadelphia, Pennsylvania, even if this is not the case. Finally, is the place noted for these particular goods? If not, this is a final indication of arbitrariness. The city of Philadelphia, whether the one in Pennsylvania or New York, is not particularly known for cream cheese in the way that, for example, Switzerland is known for watches and France, for perfumes.

Having considered these indicators of arbitrariness, I hold that "Philadelphia" is a geo-

graphic term being used arbitrarily in denoting Kraft's cream cheese. *See In re Nantucket, Inc.,* 677 F.2d 95, 99 (C.C.P.A.1982) (where there is no connection of the geographic term's meaning with the goods, the mark is arbitrary). Thus the trademark is distinctive, and therefore strong. As such, it is entitled to protection.

■ A second factor in determining the likelihood of confusion is the care taken by the consumer in purchasing the product. Cream cheese is a low-cost item purchased as either an ingredient or complementary item. Consumers are not as careful in purchasing cream cheese as they would be in buying expensive, durable goods. As Manuel Hornos, Santa Rosa's managing director, testified, an Argentine customer spends about 20 minutes in a supermarket. (Tr., p. 187). He estimated that 50 per cent of shoppers would not read the package before buying the product. (Tr., p. 188). This factor weighs in Kraft's favor as to likelihood of confusion.

A third consideration is the defendant's intent in adopting its trademark. Defendant's intent is suspect in this case. Bongrain was aware from a 1983 lawsuit brought by Kraft that Kraft had objected to East Smithfield Farms, Inc.'s use of "Old Pennsylvania" for its cream cheese. (Def. ex. 503). East Smithfield Farms is an affiliated company with Bongrain in that both are subsidiaries of the same parent. Further, Santa Rosa planned no print or television advertising for Pennsylvania brand, even though Santa Rosa's common practice in launching a new product is to do print advertising. (Tr., p. 180). Kraft, on the other hand, *had* planned an extensive advertising campaign and did in fact advertise in print. (Pls. ex. 23, 41, 42). A magazine then reported that Santa Rosa intended to promote its cream cheese with print and television advertising. (Pls. ex. 20). Defendant's intent in adopting the Pennsylvania mark indicates an intent to confuse the two marks in consumers' minds.

A fourth factor in determining likelihood of confusion is the marketing channels of the two products. Both brands of cream cheese are marketed to consumers through Argentine supermarkets. The products are in the same place in the stores and on the same shelf. (Pls. ex. 9). In one instance, packages of Pennsylvania brand were placed between packages of Philadelphia brand. (Pls. ex. 9). Such common marketing practices increase the likelihood of confusion.

A fifth factor is the marks' similarity of sight, sound, and meaning. (Pls. ex. 1; Def. ex. 501). Both "Pennsylvania" and "Philadelphia" are geographic place names. Their meanings are similar in that Philadelphia is (best known as) a city in Pennsylvania. Both words start with "P," end with "I–A," and have twelve letters. The two trademarks have the same coloring—silver, red, white, and blue—with Pennsylvania or Philadelphia in blue on a center white panel that is bordered in blue. The center panel is approximately the same size on each package.

Package similarity does not come only from the fact that the colors on both are the same. While silver is a common color for many cream cheese packages (Def. ex. 505–517), I note that the other brands' packages presented by the defendants do not have the same color scheme and design as do the Pennsylvania and Philadelphia packages. For example, some brands use red, white, and blue, but not the large white center panel. (Def. ex. 505, 508, 510, 511, 516, 517). Other brands have additional colors on their package design such as green (Def. ex. 506) or orange (Def. ex. 513). Some have dairy-related pictures of cows or barns. (Def. ex. 507, 508, 515). Of all the packages the defendants showed, no two appear as similar to me as do the Pennsylvania and Philadelphia packages. Thus, this factor also weighs in favor of finding a likelihood of confusion.

Finally, evidence of actual confusion obviously indicates the likelihood of confusion, though such evidence is not required. *Opticians Ass'n,* 920 F.2d at 195. Kraft has offered evidence of actual consumer confusion between Pennsylvania brand and Philadelphia brand. (Tr., p. 62). Jorge Bertran of Kraft Argentina described his observations of customers in an Argentine supermarket.

Based on all six of these factors, I hold that there is the likelihood of confusion be-

tween the Philadelphia and the Pennsylvania trademarks. Coupled with Kraft's ownership of the Philadelphia Brand trademark and the trademark's protectability as an arbitrary geographic name, I find that Kraft is likely to succeed on the merits in this case.

### B. Irreparable Harm to Plaintiffs

■ In addition to showing a likelihood of success on the merits, Kraft must also show irreparable injury. The key in finding irreparable injury for alleged infringement is the lack of control over trade reputation. *Opticians Ass'n*, 920 F.2d at 195. There is no evidence that Pennsylvania cream cheese is inferior to Philadelphia cream cheese. However, that is not the issue. The Third Circuit has noted that even if an infringer's products are of high quality, a plaintiff can insist that its reputation not be threatened by the actions of another. *Id.* at 195. "Potential damage to reputation constitutes irreparable injury for the purpose of granting a preliminary injunction in a trademark case." *Id.* In addition, the Third Circuit has recently held that irreparable injury follows a showing of likely confusion "as a matter of course." *Id.* Because I have already held that there is a likelihood of confusion in this case, it follows that Kraft has demonstrated irreparable injury.

### C. Extent to Which Defendants Will Suffer if a Preliminary Injunction Issues

■ Despite defendant's insistence to the contrary, an injunction would not prevent Bongrain from selling cream cheese in Argentina—or anywhere else, for that matter. It would prevent only their selling *Pennsylvania brand* cream cheese. Santa Rosa's managing director, Manuel Hornos, testified that Santa Rosa had originally imported cream cheese into Argentina in Smithfield Brand packages. (Tr., p. 160). The cream cheese was then repackaged in Argentina into Pennsylvania brand wrappers and boxes. Hornos also testified that "Smithfield" was the first choice of both Santa Rosa and Polenghi, but that they decided not to use it for a variety of reasons. (Tr., p. 164). Thus there is evidence both that Smithfield packaging is available and that it had once been

the actual brand of cream cheese shipped by Bongrain to Argentina. I am not suggesting that defendant would have to switch back to Smithfield packaging, of course, but rather that it could and, in so doing, continue to export American style cream cheese to Argentina.

A defendant can hardly claim a harm it brought upon itself. *Opticians Ass'n*, 920 F.2d at 197. Considering that the defendant chose the brand name "Pennsylvania" after knowing that Kraft had objected ten years earlier to the name "Old Pennsylvania," that it adopted packaging similar to Philadelphia brand, and that it was aware of the Philadelphia package before developing the Pennsylvania package (Tr., p. 166), Bongrain can hardly protest that it will be irreparably harmed if it must stop using the Pennsylvania name and packaging.

### D. The Public Interest

■ The last consideration in whether to issue a preliminary injunction is the public interest. In a trademark case, public interest is the right of the public not to be deceived or confused. *Opticians Ass'n*, 920 F.2d at 197. Since I have already found that there is a likelihood of confusion between Philadelphia brand and Pennsylvania brand, it follows that the public interest would be damaged if the confusing use continues. *Id.* at 198.

Based on the analysis above, I hold that a preliminary injunction should issue to bar defendant's use of "Pennsylvania" in marketing its cream cheese.

### IV. Scope of the Injunction

■ A federal court can enjoin activity outside the United States. *American Rice, Inc. v. Arkansas Rice Growers*, 701 F.2d 408, 410 (5th Cir.1983) (affirms district court's preliminary injunction enjoining defendants from any acts likely to cause confusion in Saudi Arabian consumers), *Franklin Mint Corp. v. Franklin Mint, Ltd.*, 360 F.Supp. 478, 482 (E.D.Pa.1973) (defendant held in contempt for violating injunction after placing an advertisement in a British newspaper). The question that arises in this case is whether the preliminary injunction should

apply only to Argentina, which was the focus of most of the evidence presented at the hearing, or also to Brazil and Uruguay. Kraft has not yet begun marketing its cream cheese in Uruguay. Although most of the discussion at the hearing addressed Kraft's and Bongrain's efforts in Argentina, analysis of the four factors necessary for issuance of a preliminary injunction is also applicable to Brazil and Uruguay. *Opticians Ass'n*, 920 F.2d at 191–92.

Without repeating the analysis, it is clear that the four factors are applicable no matter what country is under discussion: Kraft will likely succeed on the merits, and will be irreparably harmed if the preliminary injunction does not issue[2]. Bongrain will not be irreparably harmed by having to cease using the Pennsylvania name. Finally, the Brazilian and Uruguayan public have the same interest in not being deceived or confused as does the Argentine public.

The fact that Kraft has not yet begun its marketing effort in Uruguay does not prevent issuance of a preliminary injunction.[3] It is necessary only to show that there is a likelihood of confusion and hence of injury. A plaintiff need not wait until the threatened injury is a reality before obtaining relief. 2 McCarthy, § 30:05. Indeed, it aids the defendant to have an injunction issue at an early stage, before it has devoted time, energy, and resources to a marketing effort that may later be enjoined permanently. *Bertolli, USA, Inc. v. Filippo Bertolli Fine Foods*, 662 F.Supp. 203, 205 (S.D.N.Y.1987).

Therefore, I hold that the preliminary injunction shall apply as to enjoin Bongrain from selling its cream cheese under the brand name "Pennsylvania" in Argentina, Brazil, and Uruguay. An appropriate order follows.

### ORDER

AND NOW, this 23rd day of December, 1993, it is hereby ordered that pending final hearing and determination of this matter, the defendant and its officers, agents, servants, employees, parents, affiliates, subsidiaries and related companies, and all other persons acting in concert or participation with it or on its behalf, are preliminarily enjoined from, in any manner, directly or indirectly, using the name "Pennsylvania," either by itself or as part of a longer name, on or in connection with the advertising, selling, promoting, distributing, marketing, or displaying of any cream cheese, cheese, or food product in Argentina, Brazil, or Uruguay.

This injunction is dependent upon and shall become effective when plaintiffs provide a bond in the sum of $100,000, which shall be used as security for such costs and damages as may be incurred or suffered by defendant in the event it is found to have been wrongfully restrained or enjoined.

---

**2.** One of the factors to consider in deciding the plaintiffs' likelihood of success on the merits is the likelihood of confusion. Although Kraft did not offer evidence specific to Brazil and Uruguay on this issue, several factors entering into likelihood of confusion would not change country by country. That is, the strength of the mark; the similarity in sight, sound and meaning; defendant's intent; and consumers' care and attention paid to a low-cost food item are applicable to Brazil and Uruguay as well as to Argentina. Whether the marketing channels—directly to consumers in supermarkets—are the same in Brazil and Uruguay as in Argentina is unclear. This does not change the likelihood of confusion analysis, however, because Kraft and Bongrain would still be marketing through the same channels, whatever they may be. In addition, although Kraft presented evidence of actual customer confusion only in Argentina, proof of actual confusion is not required, and so the absence of such proof in Brazil and Uruguay does not defeat Kraft's motion for preliminary injunction in those countries.

**3.** The Third Circuit has said that a court must examine a trademark's market penetration to determine the proper geographic scope of an injunction. *Charles Jacquin Et Cie v. Destileria Serralles*, 921 F.2d 467, 472 (3d Cir.1990); *Natural Footwear Ltd. v. Hart, Schaffner & Marx*, 760 F.2d 1383, 1398 (3d Cir.1985). Market penetration is determined by four factors. *Charles Jacquin*, 921 F.2d at 472; *Natural Footwear*, 760 F.2d at 1398–99. Both of those cases involved issuance of a *permanent* injunction after trial. Because the case at bar involves a motion for a preliminary injunction, those two cases are inapplicable at this time.