

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-24-1995

# Stelwagon v Tarmac

Precedential or Non-Precedential:

Docket 94-2004

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation

"Stelwagon v Tarmac" (1995). *1995 Decisions.* Paper 235.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/235

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 94-2004
_____


STELWAGON MANUFACTURING COMPANY

Appellee,

vs.

TARMAC ROOFING SYSTEMS, INC.,

Appellant.


_____


APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

(D.C. Civil No. 92-cv-01073)

_____


ARGUED MAY 16, 1995

BEFORE: COWEN, LEWIS, GARTH, Circuit Judges.

(Filed   August 24, l995)

_____


Lawrence D. Berger (ARGUED)
Ballard, Spahr, Andrews & Ingersoll
1735 Market Street
51st Floor
Philadelphia, PA  19103

_____ Attorney for Appellant

1

David A. Gradwohl (ARGUED)
Patrick J. Doran
Pelino & Lentz
1650 Market Street
One Liberty Place, 32nd Floor
Philadelphia, PA  19103

Attorneys for Appellee

_____

OPINION OF THE COURT
_____

LEWIS, Circuit Judge.

Appellant Tarmac Roofing Systems, Inc., ("Tarmac") appeals a $1,423,392.50 judgment entered after a jury trial in the United States District Court for the Eastern District of Pennsylvania on appellee Stelwagon Manufacturing Company's ("Stelwagon") secondary line price discrimination and state breach of contract claims.[0] Specifically, the jury found that Tarmac had discriminated against Stelwagon on the basis of price in violation of section 2(a) of the Clayton Act (commonly referred to as the Robinson-Patman Price Discrimination Act), 15 U.S.C. § 13(a) (1982),[0] and, accordingly, that Stelwagon was

---

[0]    Secondary line cases involve discrimination affecting competition among customers of the discriminating seller. Barr Laboratories, Inc. v. Abbott Laboratories, Inc., 978 F.2d 98, 106 (3d Cir. 1992); J.F. Feeser, Inc. v. Serv-A-Portion, Inc., 909 F.2d 1524, 1526 (3d Cir. 1990).

[0]    Section 2(a) provides in pertinent part:

> It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and

2

entitled to recover treble damages pursuant to section 4 of the Clayton Act, 15 U.S.C. § 15(a).[0]  The jury also determined that Tarmac breached an oral, exclusive distributorship agreement with Stelwagon.  Although we believe that Stelwagon established a _prima_ _facie_ violation of the Robinson-Patman Act, we believe it failed to present sufficient proof of actual antitrust damages and is, therefore, precluded from recovering damages under the Clayton Act.  Accordingly, we will vacate the district court's judgment insofar as it awards Stelwagon treble damages under section 4 of the Clayton Act.  We will, however, affirm with respect to the breach of contract claim because we believe the district court correctly concluded that the contract claim was not barred by the Statute of Frauds.

---

> quality, . . . where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them. . . .

[0]    Section 4 of the Clayton Act provides:

> [A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws . . . shall recover threefold the damages by him sustained. . . .

I.   BACKGROUND

Stelwagon is a wholesale distributor of roofing, siding and related construction materials.  Its principal customer base consists of small to medium-sized roofing contractors located in the Philadelphia, Pennsylvania, area.  In early 1988, Stelwagon entered into an oral, exclusive distributorship agreement with Tarmac, a Wilmington, Delaware-based manufacturer of modified asphalt products ("MAPs").[0]  Under the agreement, Tarmac agreed not to sell its MAPs to any other distributors in the Philadelphia area except for Roofer's Mart, Inc., a pre-existing distributor.[0]  In return, Stelwagon promised to promote and develop a market for Tarmac MAPs.

In 1988, Stelwagon began actively promoting Tarmac MAPs as agreed.  In order to build a demand for Tarmac's products, Stelwagon refrained from acquiring any new lines of MAPs, and ceased aggressive marketing of its other, non-Tarmac MAPs. Stelwagon sold Tarmac MAPs without incident in the relationship

---

[0]   MAPs are polyester or fiberglass mats applied by torch or hot asphalt which are sold by the roll and principally used to cover flat roofs.

[0]   Tarmac insists that the terms of the contract provided for sales to Stelwagon and one other distributor, and consequently, if Roofer's Mart discontinued selling Tarmac MAPs, Tarmac could sell to another distributor.  This distinction is significant because Roofer's Mart's Philadelphia warehouse burned down in late 1989 and Tarmac began selling MAPs to Allied Roofing Products ("Allied"), another Philadelphia distributor.

Because we believe that the evidence, viewed in the light most favorable to the prevailing party, provides a rational basis for the jury's factual finding that the terms of the contract are, in fact, those terms that Stelwagon allege, we will not disturb that finding.  See Intermilo, Inc. v. I.P. Enterprises, Inc., 19 F.3d 890, 892 (3d Cir. 1994).

until early 1989, when Stelwagon became aware of sales made to several of its competitors in violation of the agreement.[0]  At around the same time, Stelwagon also learned that Tarmac was selling MAPs to two competitors -- Standard Roofing Company ("Standard") and Celotex Corporation ("Celotex") -- at preferential prices.  Stelwagon first complained to Tarmac about these sales, and eventually brought this action in February 1992.

At the close of Stelwagon's case, and again at the close of all evidence, Tarmac moved for judgment as a matter of law.  Both of these motions were denied and the case was submitted to the jury, which rendered a verdict in Stelwagon's favor on both the price discrimination and breach of contract claims, and awarded damages in the amount of $2,272,000.[0]  The district court trebled the antitrust damages under section 4 of the Clayton Act, and entered judgment for Stelwagon in the amount of $3,816,000.  Tarmac renewed its motion for judgment as a matter of law and, alternatively, for a new trial.  The district court denied the motions, but granted Tarmac's request for a remittitur based on a finding that "the damages awarded by the jury in this case are unsupported by the evidence and are grossly excessive."  Stelwagon Manufacturing Company v. Tarmac Roofing Systems, Inc., 862 F. Supp. 1361, 1369 (E.D. Pa. 1994).  The

---

[0]    Stelwagon first became aware of Tarmac's sales to Sellmore Roofing in Philadelphia, and later learned that Tarmac was selling MAPs to BJ Supply Company and Allied Roofing Co., one of Stelwagon's principal competitors in Philadelphia.

[0]    The jury awarded Stelwagon $1,500,000 in damages for breach of contract and an additional $772,000 for the antitrust violation.

district court reduced the damages award for breach of contract to $74,242, and likewise reduced the antitrust damages to $450,383.50. After trebling the Robinson-Patman damages, the district court entered judgment for Stelwagon in the amount of $1,423,392.50. This appeal followed. We have jurisdiction under 28 U.S.C. § 1291.

On appeal, Tarmac challenges the district court's denial of its post-trial motions. Specifically, Tarmac claims that the judgment should be reversed because Stelwagon failed to present sufficient evidence to (1) establish a prima facie Robinson-Patman violation; (2) prove actual antitrust injury; and (3) support the award of damages under the Clayton Act. Tarmac also argues that Stelwagon's breach of contract claim is barred by the statute of frauds.[0] Our review of the district court's denial of Tarmac's motion for judgment as a matter of law is plenary. Intermilo, Inc. v. I.P. Enterprises, Inc., 19 F.3d 890 (3d Cir. 1994). The legal foundation for the factfinder's verdict is reviewed de novo while the factual findings are reviewed to "determine whether the evidence and justifiable inferences most favorable to the prevailing party afford any rational basis for the verdict." Id., quoting Bhaya v. Westinghouse Elec. Corp., 832 F.2d 258, 259 (3d Cir. 1987).

## II. THE ROBINSON-PATMAN CLAIM

---

[0] In the alternative, Tarmac raises various trial errors which it argues require reversal. Because of our decision on the merits, however, we need not reach the remainder of Tarmac's claims.

6

By its terms, the Robinson-Patman Act is a prophylactic statute and does not require that the alleged discrimination must in fact have harmed competition. _J. Truett Payne Company, Inc. v. Chrysler Motor Corporation_, 451 U.S. 557, 561 (1981). Instead, a violation is established upon a showing that "the effect of such discrimination may be substantially to lessen competition." _Id._ For the purposes of the Robinson-Patman Act, price discrimination means nothing more than a difference in price charged to different purchasers or customers of the discriminating seller for products of like grade or quality. _Feeser_, 909 F.2d at 1532; _see_ _also_ _F.T.C. v. Annheuser-Busch, Inc._, 363 U.S. 536, 549 (1960). Price discrimination standing alone, however, is not illegal _per_ _se_. _Feeser_, 909 F.2d at 1532; _O. Hommel Co. v. Ferro Corp._, 659 F.2d 340, 346 (3d Cir. 1981). Rather, in order to establish a _prima_ _facie_ violation of section 2(a), "a reasonable possibility of harm, often referred to as competitive injury, must be shown." _Feeser_, 909 F.2d at 1531.

## A.  Competitive Injury

### 1.

We note initially that as a prerequisite to establishing secondary line injury, a plaintiff must "first prove that, as the disfavored purchaser, it was engaged in actual competition with the favored purchaser(s) as of the time of the price differential."  Best Brands Beverage, Inc. v. Falstaff Brewing Corporation, 842 F.2d 578, 584 (2d Cir. 1987).  Moreover, to satisfy this "competitive nexus" requirement, it "must be shown that, as of the time the price differential was imposed, the favored and disfavored purchasers competed at the same functional level, i.e., all wholesalers or all retailers, and within the same geographic market."  Id. at 585.

Tarmac claims that Stelwagon failed to show the requisite competitive contact with either Standard or Celotex and, as a result, did not establish a prima facie violation of the Robinson-Patman Act.  Specifically, Tarmac argues that Stelwagon was not in competition with Standard because Standard operated its business outside of the geographical area where Stelwagon's principal customer base was located, and that Stelwagon was likewise not in competition with Celotex because the two companies did not operate at the same functional level, i.e., that they did not compete at the same distribution level because Celotex is a manufacturer and Stelwagon a distributor. The district court rejected these contentions and concluded that the record contained sufficient evidence to support a finding

8

that both Standard and Celotex were in head-to-head competition with Stelwagon. We agree.

Standard is a distributor of roofing products and its customer base is similar to that of Stelwagon's. Although Standard is located in Trenton, New Jersey, there was evidence that Standard employed salespeople in Philadelphia and that it shipped directly to its Philadelphia customers from south Jersey. There was additional evidence that Standard was a principal competitor of one of Stelwagon's Philadelphia locations as well as Stelwagon's Camden, New Jersey location. In our view, this evidence was sufficient to support a finding of competitive contact between Stelwagon and Standard.

With respect to Celotex, we, too, reject the argument advanced by Tarmac that the weight of the evidence supports the conclusion that Celotex was not in competition with Stelwagon. The basis of Tarmac's argument, as mentioned above, is that the two companies were not operating at the same functional level and were, therefore, not competing customers for purposes of the Act. See F.T.C. v. Fred Meyer, Inc., 390 U.S. 341, 348-49 (1968).

It is undisputed, however, that the MAPs sold by Celotex, under its own private label, were, in fact, "manufactured," that is, made, by Tarmac. It is also uncontested that the MAPs Tarmac produced for Celotex were identical to those Tarmac sold to Stelwagon except that they did not bear the Tarmac label. Although there was evidence that tended to support

9

Tarmac's characterization of Celotex as a manufacturer,[0] the fact that there were conflicts and contradictions is of little significance, since the resolution of such inconsistencies is peculiarly within the province of the jury.  In our view, the record as a whole contains sufficient evidence to support the jury's finding, in the first instance, as well as the district court's conclusion thereafter, that Celotex "was in economic reality acting on the same distribution level as Stelwagon." Stelwagon, 852 F.2d at 1368.

2.

Once the existence of a competitive relationship has been established, "[i]njury to competition is usually shown in either of two ways:  proof of lost sales or profits, Falls City Industries [Inc. v. Vanco Beverages, Inc., 460 U.S. 428, 434-35 (1983)]; Rose Confections, Inc. v. Ambrosia Chocolate Co., 816 F.2d 381 (8th Cir. 1987), or under the Morton Salt test, proof of a substantial price discrimination between competitors over time."  Feeser, 909 F.2d at 1535.   In this case, the district court concluded that "[t]he record . . . contains evidence that would support a jury finding of harm to competition under either method."  Stelwagon, 862 F. Supp at 1368.  We thus turn to the specific evidence Stelwagon presented at trial to determine

---

[0]     For example, there was testimony from witnesses for both parties that Celotex was widely thought of and referred to as a manufacturer.  In addition, there was evidence that,like a manufacturer, Celotex sold the private label MAPs to distributors who, like Stelwagon, sold MAPs to contractors and homeowners.

10

whether the record is indeed sufficient to support a finding of competitive injury.

(a) Substantial Price Discrimination Over Time

It is undisputed that a differential existed between the prices Tarmac charged Stelwagon for its MAPs and the prices Tarmac charged Standard and Celotex. In addition, Stelwagon presented evidence that showed the price differential was substantial and that it was in effect for several years. From this evidence, we believe the jury was entitled to infer harm to competition for, as the Supreme Court stated in Morton Salt, "we believe [it is] self-evident [] that there is a `reasonable possibility' that competition may be adversely affected by a practice under which manufacturers and producers sell their goods to some customers substantially cheaper that they sell like goods to the competitors of these customers." Morton Salt, 334 U.S. at 50-51. Because the amount and degree of the price discrimination are significant factors to be considered when determining whether a price differential is substantial, Feeser, 909 F.2d at 1538, we will first address the evidence in this case that pertains to the issue of substantiality.

Stelwagon presented a report submitted by its expert, Dr. Martin Perry.[0] The report, insofar as it concerned the substantiality of the price differentials, was based on Dr. Perry's examination of Tarmac's invoices on sales of MAPs

---

[0] The district court qualified Dr. Perry as expert "in the general field of economics and specifically in the field of price discrimination, damages flowing therefrom, as well as damages flowing from breach of distribution agreements." App. at 476.

11

manufactured at its plant in Chester, Pennsylvania.  App. at 77.
The invoices, which included the date of sale, distributor,
product name, number of rolls and price charged, covered a period
from 1987 through late 1991 and included sales of six types of
Tarmac MAPs to Stelwagon and seven other distributors which, at
the time, resold MAPs in the Philadelphia area.[0]  App. at 81-82.

According to the expert report, between 1988 and 1991,
Standard received prices ranging from 5 to 20 percent lower than
the prices charged to Stelwagon and, during this same period,
Celotex received prices which ranged from 10 to 25 percent lower
than the prices Tarmac charged to Stelwagon.  App. to 88-93 and
108-122.  With respect to APP 4S, the Tarmac product which
accounted for 40.4 percent of the total unit sales of all
products included on the invoices, Standard received a 12.5
percent discount relative to the price paid by Stelwagon, while
Celotex received a discount of at least 10 percent.  App. 81 and
90-91.  Based on these figures, we believe the price differential
Tarmac offered Standard and Celotex only can fairly be
characterized as substantial.[0]

---

[0]   Of the seven distributors, we are concerned only with sales
to Standard and Celotex for the purposes of this appeal.
[0]   Another compelling factor considered by courts in
determining competitive injury in secondary line cases is the
duration of the price discrimination.  Feeser, 909 F.2d at 1539.
Generally, the longer the duration, the more likely injury will
be found.  Id., citing Rose Confections, 816 F.2d at 385 (two
years); Hasbrouck v. Texaco, Inc., 842 F.2d 1034, 1041 (9th Cir.
1987) (four years).  In our view, the four-year period analyzed
by Dr. Perry's report establishes the requisite duration of price
discrimination and further supports an inference of competitive
injury.

Because we agree with the district court that Stelwagon offered sufficient proof of a substantial price difference over time, which alone suffices to establish a violation of the Robinson-Patman Act, we need not address the issue of whether Stelwagon presented sufficient proof of lost sales or profits insofar as such evidence pertains to establishing a violation of the Act.[0]

### B. Antitrust Damages

As we stated in Feeser, "[d]emonstrating competitive injury as part of a prima facie case suffices to support injunctive relief and implicates further examination of a plaintiff's entitlement to treble damages under section 4 of the Clayton Act," Feeser, 909 F.2d at 1531; however, to recover such damages, "a plaintiff must establish cognizable injury attributable to [the] antitrust violation and some approximation of damage." J. Truett Payne, 451 U.S. at 561. In other words, a plaintiff must prove a causal connection between the price discrimination and actual damage suffered.[0] Feeser, 909 F.2d at

---

[0] As discussed below, we do not believe Stelwagon offered sufficient evidence of lost sales or profits to prove actual antitrust damages, and is therefore not entitled to treble damages under section 4 of the Clayton Act.

[0] The Supreme Court has described these two requirements collectively as "antitrust injury":

> Plaintiffs must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in

13

1539, citing Perkins v. Standard Oil Co., 395 U.S. 642, 648 (1969).  Traditionally, however, antitrust plaintiffs have not been held to an unduly rigorous standard of proving antitrust injury.  J. Truett Payne, 451 U.S. at 565.  Because

> damage issues in these cases are rarely
> susceptible to the kind of concrete, detailed
> proof of injury which is available in other
> contexts[, t]he [Supreme] Court has
> repeatedly held that in the absence of more
> precise proof, the factfinder may "conclude
> as a matter of just and reasonable inference
> from the proof of defendants' wrongful acts
> and their tendency to injure plaintiffs'
> business, and from the evidence of the
> decline in prices, profits and values, not
> shown to be attributable to other causes,
> that defendants' wrongful acts had caused
> damage to the plaintiffs."  Bigelow v. RKO
> Pictures, Inc., [327 U.S. 251, 264 (1946)].
> See also Eastman Kodak Co. v. Southern Photo
> Materials Co., 273 U.S. 359, 377-79 (1927);
> Story Parchment Co. v. Patterson Parchment
> Paper, Co., 282 U.S. 555, 561-566 (1931).

J. Truett Payne, 451 U.S. at 565-66, quoting Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 123-124 (1969).  Although the proof requirements of section 4 are "less than stringent,"  Feeser, 909 F.2d at 1540, there must be some direct evidence of injury to support an award of damages.  See id.; S&W Construction and Materials Co., Inc. v. Dravo Basic Materials Co., Inc., 813 F. Supp. 1214, 1221 (S.D. Miss. 1992);  Chrysler

---

> short, be "the type of loss that the claimed
> violations . . . would be likely to cause."
> Zenith Radio Corp. v. Hazeltine
> Research[, Inc.], 395 U.S. [100,] 125
> [(1969)].

Brunswick v. Pueblo Bowl-O-Mat, 429 U.S. 477, 489 (1977); see J. Truett Payne, 451 U.S. at 489.

14

<u>Credit Corp. v. J. Truett Payne Co., Inc.</u>, 670 F.2d 575, 581–82 (5th Cir. 1982).

Tarmac claims that Stelwagon failed to show it suffered actual antitrust injury as a result of the price discrimination. Specifically, Tarmac claims that Stelwagon fell short of proving (1) that it actually suffered lost sales and profits; (2) that any proven lost sales and profits were caused by Standard and/or Celotex receiving favorable prices; and (3) the amount of the sales and profits that Stelwagon lost. The district court, however, found that "the testimony of Dr. Perry and the anecdotal evidence of [Stelwagon's] customer's statements, admitted under the state of mind hearsay exception, . . . establish[ed] that [Stelwagon] actually lost sales to Celotex and Standard." <u>Stelwagon</u>, 862 F. Supp. at 1368. For the reasons discussed below, we disagree.

## 1.  Anecdotal Evidence

The district court admitted -- under Federal Rule of Evidence 803(3) (and over Tarmac's standing objection) -- the hearsay testimony of Stelwagon employees about out-of-court conversations with Stelwagon customers.  Essentially, the testimony was that the customers could and did purchase Tarmac MAPs from Standard at prices lower than Stelwagon's prices.

Statements that are considered under the exception to the hearsay rule found at Fed. R. Evid. 803(3),[0] commonly referred to as the "state of mind" exception, cannot be offered to prove the truth of the underlying facts asserted.  Grove Fresh Distributors, Inc. v. New England Apple Products Co., Inc., 969 F.2d 552, 556 (7th Cir. 1992), citing Herman Schwabe, Inc. v. United Shoe Machinery Corp., 297 F.2d 906, 914 (2d Cir. 1962). The district court, in explaining its decision to allow the anecdotal testimony, acknowledged the limited use of evidence admitted under Rule 803(3):  "statements of [a] customer as to his reasons for not dealing with a supplier are admissible for the limited purpose, i.e., the purpose of proving customer motive, but not as evidence of the facts recited as furnishing

_____

[0]  Federal Rule of Evidence 803(3) provides in pertinent part:

> Then existing mental, emotional, or physical condition.  A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed . . . .

16

the motive."[0]  App. at 255, citing <u>Feeser</u>, 909 F.2d at 1535 n.11; <u>United Shoe Machinery</u>, 297 F.2d at 906.  Notwithstanding this express acknowledgement, it is clear from the district court's opinion disposing of Tarmac's motion for judgment as a matter of law, that the court considered the customer statements for a purpose beyond which they were originally, and properly, admitted:

> Stelwagon [] introduced . . . the anecdotal evidence of its customer statements, admitted under the state of mind exception, <u>see</u> Fed. R. Evid. 803(3); <u>J.F. Feeser</u>, 909 F.2d at 1535 n.11; <u>Kraft Foods, Inc. v. BC-USA, Inc.</u>, 840 F. Supp. 344, 348 (E.D. Pa. 1993), <u>to establish that it actually lost sales to Celotex and Standard.</u>

<u>Stelwagon</u>, 862 F. Supp. at 1368 (emphasis added).

Because the statements properly could not have been admitted in the first instance as proof of the fact of the matter asserted, we believe the district court's reliance on them as proof of actual antitrust damages, in the form of lost sales, was in error.[0]

---

[0]    As we stated in <u>Feeser</u>, "the reason why a customer was not doing business with a particular seller is relevant in a lost profits/sales inquiry and its causal connection to the pricing practices of the alleged violator."  <u>Feeser</u>, 909 F.2d at 1535 n.11.  Although the customer statements at issue in this case clearly were admissible as evidence of why the customers were not purchasing Tarmac MAPs from Stelwagon, i.e., because they <u>thought</u> they could get a better deal elsewhere, the statements were not admissible as proof that Stelwagon's customers did, in fact, purchase MAPs from one of Stelwagon's competitors.

[0]    We hasten to note that the district court's reliance on <u>Feeser</u> in admitting the customer statements was misplaced.  Although in <u>Feeser</u> we concluded that the district court erred in excluding similar anecdotal evidence, we did so in the context of an appeal from a summary judgment proceeding.  Our de novo review of the depositions revealed that Feeser had offered sufficient admissible evidence to meet the burden of the nonmovant at

17

## 2. Expert Evidence

The only other evidence offered by Stelwagon that possibly could have supported a finding of actual injury was the expert testimony and report of Dr. Perry.  In essence, Dr. Perry's testimony with respect to Stelwagon's lost sales and profits mirrored the conclusions published in his report, which summarizes the methodology used to estimate Stelwagon's losses as follows:

> In order to forecast the lost sales of MAPs by Stelwagon as a result of the price advantage of other distributors, we begin with the year 1988 when Stelwagon first successfully introduced Tarmac's products in the Philadelphia metropolitan area.  But for the price advantage of other distributors, we assume that Stelwagon's sales of MAPs would have followed a pattern similar to Stelwagon's sales of other products (excluding MAPs). . . .  For this reason, we use Stelwagon's sales of other products to forecast the sales of MAPs. . . .  From this forecast, we then calculate the lost sales of MAPs in the years following 1988.  These lost sales can be converted into lost profits by applying Stelwagon's markup on these products.

App. at 96; see also App. at 479-481, 491-93.

In other words, based on the assumption that but for Tarmac's price discrimination, Stelwagon's sales of MAPs would have tracked its sales of non-modified products, Dr. Perry

---

summary judgment.  Feeser, 909 F.2d at 1535.  Presumably, Feeser would have been able to produce the customers themselves at trial.  Accordingly, the rule in this circuit is that hearsay statements can be considered on a motion for summary judgment if they are capable of being admissible at trial.  Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Company, 998 F.2d 1224, 1234 n.9 (3d Cir. 1993), citing Feeser, 909 F.2d at 1542.

18

concluded that Stelwagon lost $257,000 in profits as a result of Tarmac's illegal pricing policy. App. at 501.

Tarmac's challenge to Dr. Perry's testimony and report is twofold: first, Tarmac argues that the expert evidence should have been excluded because it was "speculative, not based on actual facts and data, and [because] any probative value [was] substantially outweighed by [its] prejudicial effect." Appellant's Br. at 43. Second, Tarmac claims that the expert evidence "did not constitute a `legally sufficient evidentiary basis' for the judgment rendered below." Appellant's Br. at 33. Although we do not agree with Tarmac's contention that the district court erred in admitting Dr. Perry's testimony, or in failing to strike the testimony in response to a motion by Tarmac at the conclusion of the direct examination, we do agree that, standing alone, the expert's opinions, as reflected in his testimony and report, are insufficient to support the finding of actual damage.

Significantly, Dr. Perry's analysis failed to sufficiently link any decline in Stelwagon's MAPs sales to price discrimination. The sales may have been lost for reasons apart from the price discrimination -- reasons that Dr. Perry's analysis apparently did not take into account. For example, the evidence showed that Stelwagon had higher overhead costs than its competitors. In addition, there was undisputed evidence that Stelwagon experienced other business complications during the relevant time period. In 1988, for example, Stelwagon terminated

19

a vice-president, two territorial managers and three key employees for their part in an embezzlement scheme.

We recognize, of course, that "[i]f some of [plaintiff's] injury was attributed to the price discrimination, [the defendant] is responsible to that extent." Falls City, 460 U.S. at 437; Feeser, 909 F.2d at 1537. In this case, however, the only evidence directly linking the Robinson-Patman violation to any decline in sales and profits Stelwagon may have experienced is the anecdotal testimony of Stelwagon employees that, as discussed above, should not have been admitted as proof of lost sales' profits. Not only did Stelwagon fail to offer any documentary evidence as to the effect of the discrimination on resale prices, it also failed to identify a single lost customer.[0] As a result, Stelwagon's claim for damages under section 4 of the Clayton Act must fail. See Feeser, 909 F.2d at 1540 (proof requirements of section 4 are satisfied by direct evidence of lost sales, evidence that the substantial price discrimination reflected in the resale prices of Feeser and the favored competitors directly resulted in Feeser losing certain sales and losing profits on others, and expert report outlining the magnitude of the price difference).

---

[0] In Feeser, upon which the district court relied in admitting and crediting the customer statements, we expressly noted that "[t]he evidence we find most persuasive is that of the customers of Feeser, corroborating the sales personnel's testimony, that the reason Feeser lost sales was because its prices for Serv-A-Portion products were not competitive". Feeser, 909 F.2d at 1537.

20

Having concluded that Stelwagon failed to present any direct evidence of lost sales or profits caused by the discriminatory pricing, we will reverse the district court's judgment insofar as it concludes that the record contains sufficient evidence to support an award of damages under section 4 of the Clayton Act.[0]

### III. BREACH OF CONTRACT CLAIM

In addition to the Robinson-Patman claim, Stelwagon brought a state action for breach of contract based primarily on Tarmac's MAPs sales to one of Stelwagon's principal competitors, Allied Roofing, in violation of the exclusive, distributorship agreement between the parties. Tarmac argues that enforcement of the contract is barred by the statute of frauds because the agreement was never reduced to writing and because none of the statute's exceptions apply. Specifically, Tarmac argues that the district court erred in concluding (1) that Stelwagon established a waiver of the statute by a showing of custom in the industry, and (2) that the performance exception removed the distributorship contract from the statute's protection.

Although, in general, the statute of frauds acts as a bar to the enforcement of oral agreements, it is well settled that such agreements may be taken out of the statute of frauds if there is evidence to establish that the agreement was made. M. Leff Radio Parts, Inc. v. Mattel, Inc., 706 F. Supp. 387, 394

---

[0] Because of our conclusion on the issue of Stelwagon's entitlement to damages under the Clayton Act, we do not reach Tarmac's argument that the amount of damages is unsupported by the evidence.

(E.D. Pa. 1988). This rule promotes the underlying purposes of the statute of frauds: to prevent perjury and fraud, Simplex Precast Industries, Inc. v. Biehl, 149 A.2d 121, 123 (1959), and to prevent parties from escaping their legal obligations. M. Leff Radio Parts, 706 F. Supp. at 394.

Stelwagon's contract claim survives Tarmac's statute of frauds challenge based on the established doctrine that part performance of an indivisible contract will take the whole contract out of the statute of frauds. W.I. Snyder Corp. v. Caracciolo, 541 A.2d 755, 779 (Pa Super. 1988). "We conclude it is appropriate for Pennsylvania to follow the weight of authority in this area and rule that part payment of an indivisible contract takes the entire contract outside of the requirements of the Statute of Frauds." Id.

We agree with the district court's conclusion that Stelwagon's exclusive dealing agreement with Tarmac was indivisible. Any other conclusion renders Stelwagon and Tarmac's agreement meaningless. If the contract was divisible by time or by shipments, Tarmac would only have obligated itself to deal exclusively with Stelwagon so long as it chose to do so.[0] Nor is

---

[0]    The lack of a definite date on which the agreement ends does not determine Stelwagon's claim. 13 Pa. Cons. Stat. Ann. § 2204(c) preserves a contract even if one or more terms are indefinite as long as there is a "reasonably certain basis for giving an appropriate remedy." 13 Pa. Cons. Stat. Ann. § 2309(b) states "Where the contract provides for successive performances but is indefinite in duration it is valid for a reasonable time but unless otherwise agreed may be terminated at any time by either party." Tarmac has never argued that it terminated the exclusive dealership arrangement nor that the four-year period of exclusivity by Stelwagon was not reasonable.

there any way to limit the agreement by geographic area without doing violence to the jury's conclusion that the exclusive dealing agreement between Tarmac and Stelwagon covered the whole Philadelphia area.  Once Tarmac granted Stelwagon an exclusive distributor contract, albeit orally, and acted on it, that agreement could only be enforced as a whole or not at all.

Moreover, the record reflects more than sufficient evidence of Tarmac's part performance.  From 1988 to 1989, Tarmac honored the exclusive distributor contract.  Tarmac forbade Sellmore Roofing, one of Stelwagon's competitors, from selling Tarmac MAPs in Philadelphia after Stelwagon alerted Tarmac to Sellmore's sales.  Tarmac refused to sell MAPs to Bradco, a Philadelphia roofing supplier, because of its contract with Stelwagon.  These performances validate Stelwagon's claim that an exclusive distributor contract existed.  Hence, Stelwagon's contract claims should not be barred by the statute of frauds and the jury's award of damages for that claim must be affirmed.[0]

### IV. CONCLUSION

For the reasons set forth above, the district court's denial of Tarmac's motion for judgment as a matter of law will be affirmed insofar as it pertains to Stelwagon's breach of contract claim.  We will also affirm the district court's finding that Stelwagon successfully proved that Tarmac's discriminatory pricing scheme violated the Robinson-Patman Act; however, because

---

[0]     Because of our decision on the issue of part performance, we need not address the parties' arguments with respect to usage of trade.

23

we do not believe that Stelwagon offered sufficient proof of actual antitrust damages, we will vacate that portion of the district court's judgment that upholds the jury's award of damages under section 4 of the Clayton Act, and remand the case for entry of judgment consistent with this opinion.
_____

Stelwagon Manufacturing Co. v. Tarmac Roofing Supply, Inc., No. 94-2004.


GARTH, Circuit Judge, concurring,

I agree that Stelwagon's antitrust verdict cannot stand and that Stelwago[n]
entitled to breach of contract damages.  I write separately because I have some
differences with Judge Lewis with respect to his analysis regarding Celotex Corpora[tion]
I am also of the opinion that the issue of damages as it arose from Stelwagon's rel[ationship]
with Standard should be explained.  Those differences and that explanation do not c[reate]
a difference in result.


I.

I agree with the majority that proof of actual competition is critical t[o]
of a Robinson-Patman second line price discrimination claim.  Maj. Op. typescript a[t]
As Judge Lewis' opinion states, actual competition requires proof of both function[al and]
geographic competition -- proof that "the favored and disfavored purchasers compete[d at]
the same functional level, i.e., all wholesalers or all retailers, and within the s[ame]
geographic market."  Id. (quoting Best Brands Beverage, Inc. v. Fallstaff Brewing C[orp.,]
842 F.2d 578, 584 (2d Cir. 1987)).

I cannot agree however that Celotex competed with Stelwagon.  Celotex sol[d]
private label MAPs, which were manufactured by Tarmac, in various parts of the east[ern]
including Philadelphia.  But unlike Stelwagon, Celotex sold to distributors, not to
roofing contractors.  Thus, Celotex sold to Stelwagon's competitors, not Stelwagon'[s]

25

customers.  That is to say, Celotex operated at a different functional level than

Stelwagon, i.e. one functional level above Stelwagon.

Keenan, Stelwagon's President, testified that Celotex sold almost exclusi

other distributors and repeatedly offered to sell to Stelwagon.  App. 299-300.  Not

the 163 Celotex customers identified at trial was proven or even alleged to be a ro

contractor.  App. 138-46.

Despite this evidence, Stelwagon claims that it competed with Celotex bas

Keenan's hearsay testimony that Celotex had once sold directly to Alper Roofing, a

contractor. App. 302-03.[0]  Keenan had previously testified that manufacturers occas

sold directly to contractors for large jobs.  App. 300.  I cannot agree that evider

one sale sufficed to permit the jury to conclude that Celotex competed on a general

with Stelwagon.

Nor does the record reveal that the price discount received by Celotex vi

§ 2(b) of the Clayton Act.  See Texaco v. Hasbrouck, 496 U.S. 543, 571 (1990).[0]  Th

---

[0]       I understand footnotes 16 and 17 to state that Keenan's hearsay testimony
admissible at trial for the limited purpose of showing motive only.  If indeed Stel
had produced at trial the customer who made the statement to Keenan, that testimony
certainly have been admissible.  Short of producing the actual declarant at trial,
however, Keenan's testimony was still hearsay and thus had to satisfy a hearsay exc
(here Fed. R. Evid. 803(3)).  It was accordingly admissible but limited to proof of
motive.

Stelwagon introduced evidence that other contractors bought Celotex's pro
but Stelwagon did not produce evidence that those contractors purchased the MAPs di
from Celotex. The fact that a consumer may buy Dole canned goods from Foodtown does
mean that A & P, Foodtown's competitor, is also Dole's competitor.

[0]  In Texaco, Hasbrouck had purchased gasoline for his retail station at a price wh
exceeded that which Texaco had sold to two distributors.  These distributors had th
to retail stations which they owned and to independent retail stations. 496 U.S. at
51.  The Court concluded that the distributors' mixed functions, the evidence of
intentional price discrimination by Texaco, and the amount of the discount as compa

record here is devoid of evidence of Celotex's costs as compared with any price dis

received. There is no evidence of the prices Celotex charged its customers, and th

no evidence in the record that Celotex operated both as a distributor as well as a

supplier in Philadelphia. This failure of proofs distinguishes Stelwagon's claims

those discussed in Texaco. Hence, on this record, I could not hold that Celotex co

with Stelwagon.

Despite this disagreement with the majority, I concur in Judge Lewis' opi

that Stelwagon failed to produce evidence of actual competitive injury -- that is,

evidence of actual lost sales. I therefore agree that we must reverse Stelwagon's

antitrust verdict on that account.

Even if I had not concluded that Stelwagon had failed to prove actual ant

injury, I would still vote to reverse Stelwagon's verdict because Stelwagon failed

quantify its damages adequately. While the burden of proving damage in an antitrus

is reduced, see J. Truett Payne Co. v. Chrysler Motors Corp., 451 U.S. 557, 565-67

the damages alleged must arise from whatever injury to competition has been demonst

Stelwagon's proof at trial established that Standard Roofing Supply compe

with Stelwagon only for sales out of Stelwagon's Comly (North Philadelphia) and Cam

New Jersey warehouses. Despite this, Stelwagon sought to quantify its damages only

respect to the combined sales of all six of its warehouses. Stelwagon never broke

its sales separately for the Comly and Camden locations. Given that Standard compe

only with those two warehouses, however, Stelwagon's combined sales figures could r

---

the actual costs incurred by the distributors sufficed to prove a price discriminat
claim. Id. at 572-73.

3

did not provide an adequate basis to quantify any damage which resulted from the fa

prices Standard received.

It would be impermissibly speculative to extrapolate from Stelwagon's ove

sales figures, which Stelwagon entered into evidence, the particular damage to Stel

that may have resulted from price discrimination at Stelwagon's Comly and Camden

locations.

## II.

Having expressed my reservations about the majority's opinion as to wheth

Celotex competed with Stelwagon and the quantification of damages, I nonetheless re

same result as the majority has.  Accordingly, I concur in the judgment reversing

Stelwagon's verdict on the Robinson-Patman claim and affirming Stelwagon's verdict

contract claim.

4